## CITY BANK OF HOPKINSVILLE v. BLACKMORE.

(Circuit Court of Appeals, Sixth Circuit. July 8, 1896.)

No. 393.

INSOLVENT BANK—FOLLOWING TRUST FUNDS.

Plaintiff bank sent a New York draft to the C. Bank, to be deposited to plaintiff's credit; and the C. Bank, which was insolvent, sent the draft to the N. Bank, in New York, to be deposited to its credit. The N. Bank applied the draft to reduce a debt due it by the C. Bank, the draft being paid by the drawees, after some delay, under express directions from plaintiff. *Held,* that plaintiff was not entitled to payment of the amount of the draft by the receiver of the C. Bank as a preferred claim, the amount of the assets for distribution among creditors not having been increased in that amount by the deposit of the draft.

Appeal from the Circuit Court of the United States for the Middle District of Tennessee.

This was a bill in equity filed by the City Bank of Hopkinsville, Ky., against J. W. Blackmore, the receiver of the insolvent Commercial National Bank of Nashville, to compel the payment of a claim of $5,000 out of the assets in the hands of the receiver as a preferred claim. The material facts are not in dispute. Some time before March 25, 1893, the Commercial Bank had become hopelessly insolvent, through the fraudulent management of its cashier and managing officer, Frank Porterfield. On March 24, 1893, the City Bank of Hopkinsville, which had kept an account with the Commercial Bank for several years, sent a draft on Latham, Alexander & Co., of New York, to the Commercial Bank, to be deposited to its credit. The draft reached the Commercial Bank on the morning of Saturday, the 25th. Its receipt was acknowledged by a letter to the City Bank stating that the draft had been placed to its credit. The letter reached the City Bank Monday morning, the 27th. Upon the 25th the directors of the Commercial Bank began an investigation into the affairs of the bank, and sought the aid of the other Nashville banks to tide them over what, for a short time, they believed, would be only a temporary embarrassment. In the afternoon of that day, after banking hours, they determined to surrender the bank into the hands of the comptroller of the currency, and telegraphed him their purpose. Meantime they took the bank's affairs out of the hands of Porterfield, cashier, of whose dishonesty they were becoming aware. Before this, however, Porterfield had sent off, in the Saturday evening mail, the draft of the City Bank, to be deposited to the credit of the Commercial Bank in the National Bank of the Republic, of New York. The bank examiner, by order of the comptroller, took charge of the Commercial Bank on Monday, March 27th. On the day before (Sunday) the City Bank learned that the Commercial Bank was about to be seized by the comptroller, and telegraphed Latham, Alexander & Co., the drawees of the draft, to stop payment. The draft reached New York Monday morning, and was credited by the National Bank of the Republic to the Commercial Bank. When the draft was presented for payment to Latham, Alexander & Co., payment was refused, and the draft was protested for nonpayment. The National Bank of the Republic had applied the draft, as was intended by Porterfield, to reduce an indebtedness of the Commercial Bank to it. When payment was refused on the draft, the National Bank of the Republic at once began garnishment proceedings, and attached funds of the City Bank in the hands of Latham, Alexander & Co. and the Western National Bank. For fear of injuring its credit, and because they were advised that recovery could be had on the draft, the City Bank directed Latham, Alexander & Co. to pay it. This was done, and the attachment proceedings were dismissed. The City Bank then presented a claim to the receiver for some $11,465 owing to it by the Commercial Bank, and asked that $5,000 of it, growing out of the deposit of the draft, should be given priority as a preferred claim. The receiver refused to allow the claim for $5,000 unless the claim for a preference was withdrawn. Accordingly, the claim for the whole amount, without preference, was made and allowed in June, 1893, and dividends amounting to 55 per cent. of the entire claim have since been paid to the City Bank. Afterwards, on December 29, 1894, this bill was filed, seeking the relief stated. The court below held that the complainant was not entitled to priority in respect of the $5,000, and dismissed the bill.

John Ruhm, for appellant.

J. M. Head, for appellee.

Before TAFT and LURTON, Circuit Judges, and HAMMOND, J.

TAFT, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

The decree of the circuit court must be affirmed. It may be conceded that the circumstances under which the draft was received by the Commercial Bank, and credited to the City Bank, would justify the latter in rescinding the contract of deposit, on the ground of fraud, and that then the City Bank would be entitled to a return of its draft. If the draft had come into the hands of the receiver, therefore, it would have been his duty, and the court below would doubtless have compelled him, to deliver up the draft to the complainant. But the difficulty with the complainant's position is that neither the draft nor the proceeds of the draft have come into the receiver's hands. The National Bank of the Republic claimed to be a purchaser of the draft in due course of business, by crediting its amount upon an account due it from the Commercial Bank. Whether this was a well-founded claim in point of law or not, it is not necessary for us to decide, because the City Bank conceded its validity, and accordingly directed the draft to be paid. As against the Commercial Bank or its receiver, the City Bank cannot be heard to say, then, that the title of the National Bank of the Republic to the draft was not good against itself, and therefore against the Commercial Bank. Hence it follows that the credit allowed to the Commercial Bank for the draft was properly allowed on the books of the National Bank of the Republic. The sole question is, therefore, whether the credit thus secured to the Commercial Bank and its receiver by the draft entitles the City Bank to take $5,000 out of the assets held by the receiver. The question must certainly be answered in the negative, in any view which can be taken, unless it appears that the assets were increased $5,000 by the credit, or that the claims against them were so decreased that there was $5,000 more for distribution among those who remained creditors after the credit than there would have been had no credit been given to the Commercial Bank for the draft. This does not appear. If no such credit had been allowed by the National Bank of the Republic, it would merely have been a claimant for $5,000 more, and would have been entitled, not to $5,000 in full, but only to pro rata dividends on that amount. The benefit to the general fund from the draft, therefore, is limited to the amount of the dividends payable on $5,000, and that amount the receiver has already allowed to the City Bank. It has no ground for complaint, therefore. No authority has been cited to show that a claim founded on fraud is entitled to a priority over other claims. It is only where, by the rescission of the contract out of which the claim arises, on the ground of fraud, the specific thing parted with or its proceeds can be sufficiently identified to be returned, that fraud seems to give a priority of distribution. It may not be necessary to show earmarks upon the proceeds of the thing parted with to justify such a remedy, but it must at least appear that the funds in the hands of the receiver were increased or benefited by the proceeds, and the recovery is limited to the extent of this increase or benefit.

In every case relied on by counsel for appellant, recovery, if decreed, was based on the fact that the property in the hands of the assignee or receiver of the person or bank against whom the

claim of fraud, right to rescind, and priority of distribution was made, included in its mass either the very thing parted with or its proceeds. Railroad Co. v. Johnston, 133 U. S. 573, 10 Sup. Ct. 390; Armstrong v. Bank, 148 U. S. 50, 13 Sup. Ct. 533; Cragie v. Hadley, 99 N. Y. 131, 1 N. E. 537.

The exact question is discussed with satisfactory fullness in Bank v. Latimer, 67 Fed. 27; and the necessity for the presence of the proceeds of the very thing obtained by fraud in the mass of assets to be distributed is clearly pointed out.

Mr. Justice Bradley, in Frelinghuysen v. Nugent, 36 Fed. 229–239, describes the growth of the equitable doctrine on this head and its limits as follows:

"Another difficulty in the complainant's case is the want of identity of the property claimed with the proceeds of the money abstracted from the bank. Formerly the equitable right of following misapplied money or other property into the hands of the parties receiving it depended upon the ability of identifying it, the equity attaching only to the very property misapplied. This right was first extended to the proceeds of the property, namely, to that which was procured in place of it by exchange, purchase, or sale; but if it became confused with other property of the same kind, so as not to be distinguishable, without any fault on the part of the possessor, the equity was lost. Finally, however, it has been held as the better doctrine that confusion does not destroy the equity entirely, but converts it into a charge upon the entire mass, giving to the party injured by the unlawful diversion a priority of right over the other creditors of the possessor. This is as far as the rule has been carried. The difficulty of sustaining the claim in the present case is that it does not appear that the goods claimed—that is to say, the stock on hand finished and unfinished—were either in whole or in part the proceeds of any money unlawfully abstracted from the bank. On the contrary, the goods and stock on hand were purchased of the other creditors of Nugent & Co. almost entirely, if not wholly, on credit, and really stand in the place of, and represent the debts of, the firm due and owing to said creditors. This is true with regard to all the raw stock on hand, and with regard to all the stock and materials from which the manufactured or partially manufactured goods were produced. If any moneys derived from the bank entered into the latter, they were those moneys which were regularly drawn by checks of the firm weekly for the payment of their hands. It seems impossible, therefore, to sustain any such general charge or trust upon the goods and property of Nugent & Co. as that which has been set up and claimed by the complainant."

See, also, National Bank v. Insurance Co., 104 U. S. 68; In re Hallett's Estate, 13 Ch. Div. 696.

Counsel for appellant contend that the evidence shows that the sending of the draft to the National Bank of the Republic had resulted in releasing and returning to the receiver collaterals of more value than $5,000, and that these must be treated as the proceeds of the draft. It is enough to say that there is no competent evidence of this in the record. The only foundation for the claim is that the president of the City Bank testifies that a bank examiner told him of the return of the collaterals a considerable time after the event, at a bankers' convention. This, of course, was hearsay evidence, and wholly incompetent to prove the fact. Indeed, it was not introduced for that purpose, but only to explain the apparent laches of the City Bank in making no claim for a preference in accepting dividends as upon an unpreferred claim, and in not filing the bill

herein for 18 months after the happening of the fact upon which its validity depended.

In view of our conclusion upon the merits, we need not consider the question of waiver and laches, which were also formidable obstacles in the path of complainant to success in this case. The decree of the circuit court is affirmed, with costs.