## SPOKANE & EASTERN TRUST CO. v. UNITED STATES STEEL PRODUCTS CO.

(Circuit Court of Appeals, Ninth Circuit. July 2, 1923. Rehearing Denied August 6, 1923.)

### No. 3983.

1. **Banks and banking ☞166(1)—Facts held to show collecting bank was trustee of proceeds collected.**

Where a check, which had been sent to plaintiff by a customer, was remitted through plaintiff's bank to another bank for collection, with a letter stating it inclosed for return the following cash items and instructed delivery of the documents only on payment of drafts attached, the circumstances affirmatively show that the collecting bank became a trustee of the proceeds collected, and not that the plaintiff consented to a relationship of debtor and creditor between him and the collecting bank.

2. **Courts ☞372(1)—United States courts exercise independent judgment on questions of general commercial law.**

On questions of general commercial law, the courts of the United States will exercise their independent judgment, and are not bound by the decision of the courts of the state; so that a rule established by the state court that a collecting bank is a debtor for the amount collected, in the absence of a special agreement to the contrary, is not binding.

3. **Trusts ☞372(3)—Evidence held to show bank, receiving proceeds of collection by another, knew of insolvency.**

In a suit to recover from defendant bank the proceeds of a check received by defendant from a bank to which the check had been sent by plaintiff for collection, evidence *held* to show that at the time the collection was made and the amount received by the defendant bank, and applied to debt of collecting bank to defendant, it had knowledge through a former employee, who was representing it with the collecting bank, that the latter was insolvent.

4. **Banks and banking ☞320—Items not held for collection should be first applied to payment of checks presented in clearance.**

Where a bank presented for clearance some checks which it owned and others which it held for collection only, the amount due on the checks owned by it should be first applied to the payment of checks drawn on it, which were presented against it at the time of the same clearance.

5. **Trusts ☞374—Deduction from proceeds of collection of proportion of loss in clearing held proper.**

Where a bank to which plaintiff and others had sent checks for collection lost in the clearance one-seventeenth of the total amount of the checks held for collection, plaintiff was properly permitted to recover from another bank, which had received the proceeds of the collection, the amount of its check less one-seventeenth thereof.

6. **Trusts ☞356(2)—Trust funds, which did not pass into hands of liquidator, can be followed by beneficiary.**

Funds held by a collecting bank in trust for the payee of the check sent for collection, which had been transferred to defendant bank before the liquidator took possession of the collecting bank, so that they never came into the liquidator's possession, can be recovered from defendant bank.

Appeal from the District Court of the United States for the Southern Division of the Eastern District of Washington; Frank H. Rudkin, Judge.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Suit in equity by the United States Steel Products Company against the Spokane & Eastern Trust Company. Decree for plaintiff, and defendant appeals. Affirmed.

F. H. Graves, W. G. Graves, and B. H. Kizer, all of Spokane, Wash., for appellant.

Walter Shelton, of San Francisco, Cal., and John H. Powell and Peters & Powell, all of Seattle, Wash., for appellee.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

HUNT, Circuit Judge. This is a suit by the Steel Company, appellee, to recover the proceeds of a check from the Spokane & Eastern Trust Company, a banking corporation, called the Spokane Bank, appellant. The Central Bank & Trust Company of Yakima, called the Central Bank, and Farnsworth as director of taxation and examination of the state of Washington, were made defendants, the Central Bank being regarded by the Steel Company as in a trust relationship alleged to exist between itself and plaintiff, while Farnsworth, as director aforesaid, was included because he was liquidating the Central Bank at Yakima as an insolvent bank, and was exercising the functions of a receiver. From a decree in favor of the Steel Company and against the Spokane Bank, the bank appeals.

Shortly before January 19, 1921, the Yakima Hardware Company mailed its check, drawn on the Central Bank & Trust Company, for approximately $47,000, to the Steel Company. The Steel Company, a customer of the Seattle National Bank, received the check, and on January 19, 1921, indorsed it to the order of the Seattle National Bank and delivered it to that bank for collection and deposit to the credit of the Steel Company. On the deposit slip were these words:

"In receiving checks or other items on deposit payable elsewhere, * * * this bank assumes no responsibility for the failure of any of its direct or indirect collecting agents, and shall only be held liable when proceeds in actual funds or solvent credits shall have come into its possession. Under these conditions items previously credited may be charged back to the depositor's account."

On the same day the Seattle Bank forwarded the check, with other items, by mail to the Central Bank at Yakima, through which it made its Yakima collections. The remittance letter said:

"We inclose for returns the following cash items, which bear this stamp. N. P. 19–7 or similar authority of preceding indorser, or the words No. Pro. Wire nonpayment of items $250 or over. Deliver documents only on payment of drafts attached unless otherwise instructed."

The Central Bank of Yakima, not being a member of the Yakima clearing house, cleared through the Yakima Valley Bank. The Valley Bank received the items mailed in the letter of the Seattle Bank to the Central Bank, and on January 21st the items, with others aggregating approximately $59,000, were paid to the Central Bank; the Valley Bank retaining about $1,500 on deposit to the credit of the Central Bank. The Valley Bank turned over to the Central Bank two drafts, one for $45,000, drawn on the Bank of California at Tacoma, and the other for $3,000, drawn on the Fidelity National Bank

of Spokane. However, the Central Bank did not forward any of the proceeds of the check to the Seattle National Bank, but transmitted the two drafts and other items to the appellant bank at Spokane, and then drew a draft on the appellant bank at Spokane in favor of the Seattle National Bank for approximately $51,000, the full amount of the collection items received by the Central Bank from the Seattle National Bank. On the following day, January 22d, the Spokane Bank received the remittances from the Central Bank of Yakima, and deposited the same to the credit of that bank, and on the same day collected at Spokane the draft for $3,000, and on the 24th of January collected the draft for $45,000 at Tacoma. On January 26th the draft in favor of the Seattle National Bank was presented to the Spokane Bank.

Prior to the presentation of the draft, the Spokane Bank learned that the draft upon it had been issued and was outstanding, and charged back to the Central Bank at Yakima certain rediscounts and other paper indorsed by the Central Bank of Yakima, and in this manner sought to apply all the proceeds of the Steel Company check to an indebtedness of the Central Bank. When the Seattle check or draft was presented on January 26th, payment was refused, and afterwards, when demand was made by the Steel Company to pay over the proceeds of the check so received by the Spokane Bank, payment was refused. When the Seattle Bank was advised of the nonpayment of the draft, it charged back to the Steel Company the amount of the check for which the Seattle Bank had given a credit, and the Steel Company never has received any return on account of its check. It is not disputed that the Central Bank & Trust Company of Yakima was in fact insolvent during January, 1921, and that it was closed by the bank examiner on January 27th thereafter.

[1] Looking to the question whether the Central Bank ever had title to the Hardware Company's check, sent to it by the Seattle Bank, we are of the opinion that the writings between the remitting bank and the collecting bank at Yakima not only fail to disclose consent to any relationship of debtor and creditor, but affirmatively show that the relationship became one whereby the collecting bank was a trustee of the proceeds collected. We are also of the opinion that the Central Bank, at the time that it acted in the matter of collection, was insolvent and not in a position to become a debtor of the Steel Company. The rule as established by the weight authority is that where a bank transmits negotiable paper for collection and returns, the bank which receives the check and undertakes the collection is the agent of the principal, and becomes a trustee of the proceeds for the owner, and, except where consent is given, the collecting bank cannot avoid such relationship and create that of mere debtor and creditor. Among many cases where the rule is clearly stated are: Holder v. Western German Bank, 136 Fed. 90, 68 C. C. A. 554; Continental Nat. Bank v. Weems, 69 Tex. 489, 6 S. W. 802, 5 Am. St. Rep. 85; Nat. Reserve Bank v. Nat. Bank, 172 N. Y. 102, 64 N. E. 799; Titlow v. McCormick, 236 Fed. 209, 149 C. C. A. 399. Nor is such trust relationship necessarily extinguished by the fact that the collecting

bank has commingled the funds collected with its own, or that at other times the collecting bank has, in acting for the remitting bank, pursued a method of remitting by draft or other form not in specie.

We do not understand Commercial Bank v. Armstrong, 148 U. S. 50, 13 Sup. Ct. 533, 37 L. Ed. 363, as in conflict with the rules stated. There the contract required a settlement between the banks only upon certain days of each month, and under the facts the court concluded that the collections made were not to be placed on special deposit and held until the day for remitting, but were to be treated as a general deposit, the transmitting bank being regarded as a general depositor. The court, however, in considering the proceeds of collections made by subagents, regarded the receiver as a trustee for the proceeds, and held that title to such proceeds remained in the owner, notwithstanding the collection and credit arrangement. The paper had been honored and paid, but the actual proceeds had not been transmitted to the failing bank, nor were they reduced to actual possession; the subagents claiming title to the proceeds. The marked difference between that case and this is that in the one an arrangement showing intention to extend credit was found, while in the other the transaction was intended to be a cash one without extension of credit.

Bowman v. Bank, 9 Wash. 614, 38 Pac. 211, 43 Am. St. Rep. 870, is also relied upon by appellant. The case undoubtedly sustains appellant's argument to the effect that where there is no special agreement between them, by reference to the general banking custom in Washington, the collecting bank was not to hold the money collected as a special deposit and remit in specie, but was expected to commingle such money with its general funds and make settlement by means of a draft on another bank, and that when the collection is made the relation between the collecting bank and the correspondent or customer for whom it makes collection is that of debtor and creditor, and not that of trustee and cestui que trust. Hallam v. Tillinghast, 19 Wash. 20, 52 Pac. 329, may also be in accord with appellant's contention. It would appear that the more recent case of Raynor v. Scandinavian Bank (Wash.) 210 Pac. 499, has modified the earlier decisions, at least with respect to the right to trace trust funds.

[2] But, granting that the appellant is correct in its interpretations of the decisions of Washington, and that a construction of the law of the state should become the rule of decision in a trial in a court of the United States in cases where such rule is applicable, nevertheless it is well established that upon questions of general commercial law the courts of the United States will exercise their independent judgment, and are not bound by the decisions of the courts of the state. In Oates v. National Bank, 100 U. S. 239, 25 L. Ed. 580, in an action concerning a promissory note made and payable within the state of Alabama, the Supreme Court cited earlier cases and upheld that doctrine, saying that it had been "so frequently announced that we need only refer to a few leading cases bearing upon the subject." Titlow v. McCormick, supra; In re Jarmulowsky, 249 Fed. 319, 161 C. C. A. 327, L. R. A. 1918E, 634.

[3] We may also rest affirmance of the decree upon the ground that, when the transaction involved occurred, the insolvency of the Central Bank of Yakima was well known to the officers of that bank and to those of the Spokane Bank. To recapitulate the testimony would extend the opinion to needless length. Hence we refer to but a few facts which impress us as of special importance. In December, 1920, the bank felt obliged to use the legal limit of borrowing in order to provide itself with cash. In January, 1921, there was a run upon the bank, and deposits dropped over $100,000 by January 21st. Collections were bad, and resort was had to the rediscounting of bills with a bank at Seattle and with the Spokane Bank. But the money obtained in this way was insufficient. There was a large overdraft with the Spokane Bank. While the withdrawals were going on in January, the bank was obliged to cover dishonored and past-due drafts amounting to several thousand dollars, and was confronted with maturing contingent liability on the rediscounted notes. It would be most unreasonable to say that the officials of the Central Bank did not know that the quality of the paper held by the bank was of very doubtful value. It could not have been difficult to appraise the value of the bills receivable, and surely it was known what paper had been renewed, what discounts had been negotiated, and what collections had been urged in order to meet pressing needs. Just before the Central Bank closed, it owed the Spokane Bank about $160,000. Conditions were very bad, and on January 5th, after the president of the Central Bank had been in Spokane to confer with the Spokane Bank officials, Mr. Buckholtz, who was a trusted employé of the Spokane Bank, went to Yakima with the president of the Central Bank to take charge of its credit department.

Whether, before leaving Spokane, Mr. Buckholtz severed his official connection with the Spokane Bank, is not of vital importance. Let it stand that he was taken off the pay roll. Even so, no employé could have been more careful of the interests of an employer than was he of the interests of the Spokane Bank. No agent could have given more attentive care to the business of his principal. After Buckholtz went into the Central Bank he had charge of the note pouch and was in almost daily communication with the officials of the Spokane Bank. He handled the rediscounts for the Spokane Bank, selected the paper to be sent to it, was advised by the Spokane Bank officials as to certain notes to be sent, and gave them detailed advice of the affairs of the Central Bank. In one of his letters to the vice president of the Spokane Bank he wrote that certain notes were in his possession "as agent of the Spokane & Eastern Trust Company." His authority in the credit department was complete. The president of the Central Bank testified to the effect that Buckholtz was specially charged with the interests of the Central Bank in its relations with the Spokane Bank.

On January 17th the Central Bank advised the Spokane Bank that the cash reserve was running from 6 to 10 per cent., and was scarcely more than the cash on hand in the bank as actual collected balances. It is very clear, too, that the cashier of the Central Bank knew all the

facts concerning the failing condition of the bank. Mr. Buckholtz distinctly advised the Spokane Bank that the only way to liquidate the indebtedness to the Spokane Bank was to collect on the loans, and that all the paper which he had "nerve enough to send for rediscount" was in the Spokane Bank. On January 21st he advised the vice president of the Spokane Bank that he would have to stretch his imagination and "use a high-powered microscope" in looking at the "favorable points to the situation." The vice president of the Spokane Bank, in writing to Buckholtz, urged a possible sale of the bank. On the 22d of January the Governor of the state conferred with the bank examiner and insisted that an examination of the Central Bank should be made, but the president of the Spokane Bank suggested· that no hasty action be taken and added:

"We have a man over there who is looking after things, and things are coming along very nicely."

On January 24th the vice president of the Spokane Bank wrote that, if conditions continued as they then were the institution would soon be where no one would purchase, and then "it is a case of either closing its doors or getting some one to see it·through." On the 23d of January Buckholtz wrote Mr. Rutter, of the Spokane Bank, that they had mailed a $51,000 draft on the Seattle National Bank, covering a large letter of items on other local banks, the net of which had been remitted to the Spokane Bank. The assistant cashier of the Seattle National Bank testified that on January 27th Buckholtz told him that he (Buckholtz) had discussed the cash remittance letter with the Spokane Bank officers over the telephone, and that those officials knew that the draft was outstanding. The cashier of the Central Bank said that on January 21st the "cash letter" was talked over with Mr. Buckholtz and was seen by him, and that together the two of them decided to send it to Spokane. Buckholtz denied having seen the cash letter, but admitted that on January 21st the cashier of the Central Bank told him of the nature of the letter.

There is also credible evidence that the vice president of the Spokane Bank knew on the 21st by a telephone message of the cash remittance letter. More than this, Buckholtz wrote to him under date of the 21st that the bank was without cash, and that it would hold what few pennies could be collected on the Spokane Bank collateral notes. Much more might be cited in support of the conclusion that Buckholtz acted as agent of the Spokane Bank, knew that the situation of the Central Bank was hopeless, that he furnished to the officials of that bank knowledge of its insolvency, and·that those officials knew of the collection of the check here involved from the time it was in the hands of the Central Bank until the draft was dishonored by the Spokane Bank. Union Stockyards National Bank v. Moore, 79 Fed. 705, 25 C. C. A. 150; Arnold v. San Ramon Bank, 184 Cal. 632, 194 Pac. 1012, 13 A. L. R. 320. Because of widely differing facts, Fidelity & Deposit Co. et al. v. Kelso (C. C. A.) 287 Fed. 828, has little appositeness to the present case.

· Finally, appellants contend that for the recovery of trust funds it must be shown that the property of the plaintiff, or its proceeds, has come into the defendant's hands and has been retained by the defendant, or that defendant has received the benefit of it—that is, there must be an augmentation of the funds of the defendant by reason of the receiving of the property of the plaintiff—that this must be shown even though the third party is the receiver of a bank, representing general creditors, or an independent third party, who is said to have received the trust fund prior to the insolvency of the bank. It is to be remembered that the clearing bank presented the $47,000 check and other collection items, all amounting to $51,000, and at the same time the Yakima Valley Bank received from the Central Bank for clearance local checks on local banks amounting to approximately $7,800, thus making total items of $59,000. On the same day other banks at Yakima also presented items against the Central Bank, aggregating approximately $9,000. The balance of clearance in favor of the Central Bank was approximately $50,000; but the local checks presented by the Central Bank did not aggregate an amount large enough to offset the amount of local checks presented.

[4, 5] As approximately $7,000 of checks held by the Central Bank are not shown to have been held in any trust relationship, it will be presumed that the Central Bank owned these checks, so that the $7,000 should be applied toward the payment of the collections of $9,000 items presented against the Central Bank. Spokane County v. First National Bank, 68 Fed. 979, 16 C. C. A. 81; Raynor v. Scandinavian-American Bank, supra; Empire State Surety Co. v. Carroll County, 194 Fed. 593, 114 C. C. A. 435. The check involved was approximately $48,000, and the amount of the drafts of the Central Bank was also $48,000, but with items to which trust relationship attached the aggregate was $51,000. Apparently about $3,000 of it was lost in the clearance, and in this way the Steel Company lost about one-seventeenth of the total amount of its check. Accordingly, it had judgment for sixteen-seventeenths of the amount of the check. This appears to be just. Cragie v. Hadley, 99 N. Y. 131, 1 N. E. 537, 52 Am. Rep. 9; Foster v. Rincker, 4 Wyo. 484, 35 Pac. 470.

[6] The question of preference as against general creditors need not be considered, for the reason that the Steel Company does not seek to establish a trust upon the funds in the hands of the liquidator of the Central Bank. The Steel Company has a right to reach funds which never passed into the possession of the receiver or liquidator, in that they had been transmitted to the Spokane Bank before the liquidator took charge. It may be said, however, that, even if the proceeds had passed into the hands of the liquidator, doubtless the Steel Company could pursue them. Raynor v. Scandinavian-American Bank, supra.

Our judgment is that a serious injustice was done to the Steel Company, and that the District Court was correct in ruling that it was entitled to recover as allowed in the decree.

Decree affirmed.