## ELLERBE et al. v. STUDEBAKER CORPORATION OF AMERICA.

Circuit Court of Appeals, Fourth Circuit.
October 18, 1927.

No. 2626.

1. **Banks and banking ☞166(1)—Owner of draft sent bank for collection, bank's check not being paid, was entitled to proceeds of collection, if traceable into receiver's hands.**

Owner of draft sent bank for collection and prompt remittance, there being nothing in contract between parties authorizing collecting bank to appropriate proceeds of collection and make itself mere debtor, or to send its check in settlement, when its check was not paid, was entitled to proceeds of collection, if they could be traced into funds which came into hands of receiver.

2. **Banks and banking ☞166(1)—Proceeds of draft collected by insolvent bank were held in trust for owner.**

Where bank to which drawer forwarded draft for collection was insolvent at time it made collection, proceeds of collection were held in trust for drawer, and could be collected from receiver after they had come into his possession, since insolvency of collecting bank terminates its authority to proceed further.

3. **Banks and banking ☞166(1)—Owner of draft collected by insolvent bank cannot have trust declared on assets in receiver's hands, unless he traces proceeds into receiver's hands, or shows assets were augmented.**

Owner of draft collected by insolvent bank is not entitled to have trusts declared on assets in hands of its receiver, or to preferential payment therefrom, unless he is able to trace proceeds of collection into hands of receiver, or to show that assets which have come into his hands have been directly augmented as a result thereof.

4. **Equity ☞56—Equity regards substance, and not form.**

Equity regards substance, and not form.

5. **Banks and banking ☞80(4)—Where drawee paid draft by check on collecting bank, and deposited checks on outside banks to cover same, assets passing into receiver's hands were augmented, entitling drawer to preference.**

Where drawee of draft for $2,899.77 paid same by check on collecting bank, and at same time made deposits, including checks on out of town banks, which brought $2,471 into receiver's hands, to meet draft, assets coming into receiver's hands were directly augmented by proceeds of draft, entitling drawer to preference, and right of drawer to funds realized from checks on other banks could not be defeated, merely because drawee deposited checks to its credit, and gave check against credit, instead of indorsing them over in payment of draft.

6. **Banks and banking ☞80(4)—Assets coming into receiver's hands held augmented by drawee's check for draft, entitling drawer thereof to preference.**

Where, if check on collecting bank given by drawee in payment of draft had not been

given, drawee, as depositor, would have set-off against receiver on note due bank for amount of its deposit, which would have been increased by amount of check given for draft, assets coming to receiver's hands were augmented by amount of check given for draft, entitling drawer of draft to preference.

7. **Trusts ☞352—Where fraudulent depositary mingles goods obtained by fraud with his own, whole is held in trust.**

Where fraudulent depositary so mingles goods obtained by fraud with mass of like goods of his own, whole may be considered as held in trust until equitable separation of property of defrauded party is made, and where money thus obtained has gone to swell aggregate in possession of fraudulent party, it may under proper proceedings be segregated in amount from such aggregate sum and made subject of trust.

8. **Banks and banking ☞80(4)—Proceeds of collection of draft held traced into funds in receiver's hands derived from collection of note due from drawee to bank, and drawer was entitled to preference.**

Where it was shown that bank receiver relied on check given by drawee on bank in payment of claimant's draft to reduce deposit account, which was valid set-off to note due from drawee to bank, and was thereby enabled to collect on note $2,899.77, amount of draft, more than he would have been able to collect otherwise, proceeds of collection of draft *held* traced into funds derived by receiver from collection of note, so that claimant was entitled to preferential payment.

9. **Banks and banking ☞135—Note pledged by bank, when redeemed by receiver, became subject to set-off to extent of deposit standing to credit of maker.**

Where note given bank was pledged as collateral security by bank, when note was redeemed by receiver, it became subject in his hands to set-off to extent of deposit standing to credit of maker on books of bank, just as though it had never been pledged.

10. **Banks and banking ☞135—Rule that rights of parties become fixed when bank closes means that debtor cannot set off claim after insolvency against debt contracted before.**

Rule that rights of parties become fixed when bank closes its doors means that debtor of bank cannot set off claim acquired after insolvency against debt contracted before, and does not mean that he cannot set off deposit against note owned by bank and collected by its receiver, merely because at time of bank's failure note was held by another bank, to which it had been pledged as collateral.

In Error to the District Court of the United States for the Eastern District of South Carolina, at Charleston; Ernest F. Cochran, Judge.

Suit by the Studebaker Corporation of America against D. E. Ellerbe, as receiver of the First National Bank of Florence and the First National Bank in Florence. Judg-

ment for complainant, and the receiver and the bank bring error. Affirmed.

See, also, 10 F.(2d) 590.

A. L. Hardee and F. L. Willcox, both of Florence, S. C., for plaintiffs in error.

C. W. Muldrow, of Florence, S. C., and R. E. Whiting, of Charlotte, N. C., for defendant in error.

Before PARKER and NORTHCOTT, Circuit Judges, and SOPER, District Judge.

PARKER, Circuit Judge. Although this cause was instituted and heard in the court below as an action at law, and was brought here by writ of error, it is, in reality, a suit in equity to establish a trust in or a lien upon certain funds in the hands of the receiver of an insolvent national bank. No point, however, has been made with respect to this, and, as the procedure followed below was that appropriate to the trial of a suit in equity, and as we are authorized to treat the writ of error as an appeal, we shall follow the course pursued by us in National Surety Co. v. Board of Education, 15 F.(2d) 993, and dispose of the case as though properly heard in equity and brought before us by appeal.

Complainant is the Studebaker Corporation of America. On March 16, 1925, it drew a draft on G. C. Chandler, of Florence, S. C., for the sum of $2,899.77, and forwarded same to the First National Bank of Florence, S. C., for collection and prompt remittance. On March 25, 1925, the bank collected the draft, taking in payment a check of G. C. Chandler, Inc., drawn against funds which it held on deposit to the credit of Chandler, Inc. It sent to complainant a check drawn on the State & City Bank & Trust Company, of Richmond, Va., which was protested for nonpayment. The First National Bank of Florence closed its doors on March 25th, the same day on which it made the collection, having become unable to meet the demands of depositors and creditors, and defendant receiver was placed in charge of its affairs.

At the time G. C. Chandler, Inc., gave the check for $2,899.77 in payment of the draft, it deposited in the bank the sum of $3,418.35. Included in this deposit were a check for $1,611 on the People's Bank of Darlington, S. C., and a draft for $860 on the Industrial Acceptance Corporation of Indianapolis, both of which were collected by the receiver after he took charge. Before the deposit was made, Chandler, Inc., had a balance of only $17.92. After the deposit checks for $262.64 and $20.06 were charged against the account, in addition to the check for $2,899.77, so that when the bank closed its doors the balance to the credit of Chandler, Inc., was $253.80.

Prior to March 25, 1925, Chandler, Inc., had executed a note to the First National Bank of Florence for the sum of $15,000. When that bank closed its doors, this note was held by the Federal Reserve Bank of Richmond, Va., as collateral security to a note of the First National of Florence. The Federal Reserve Bank, however, held other collateral of a value greatly in excess of the amount of the note of the First National of Florence, and this collateral, with the Chandler note, was redeemed for the account of the receiver. The Chandler note was perfectly good and collectible, and was in fact collected by the receiver in full, less the sum of $253.80, which was allowed as a set-off on account of the deposit to the credit of Chandler, Inc., when the bank failed.

Upon these facts the learned District Judge held that the proceeds of the collection were held in trust for complainant, that the assets in the hands of the receiver were augmented by the amount thereof, and that complainant was entitled to a preference on the funds in the hands of the receiver to the amount of its claim. The receiver has appealed, and his contention is that no trust arose in connection with the proceeds of collection, and that there has been no sufficient tracing of trust funds or augmentation of assets to justify the holding that complainant is entitled to preferential payment.

[1] We think that there is no question that the collecting bank held the proceeds of collection in trust for complainant. This was not a transaction between banks under a custom authorizing the collecting bank to credit the sending bank with collections, as in Commercial Bank v. Armstrong, 148 U. S. 50, 13 S. Ct. 533, 37 L. Ed. 363, nor was it a deposit of collection items under a custom which authorized the collecting bank to deposit collections to the account of the customer. The draft was sent for collection and prompt remittance, and there was nothing in the contract between the parties, and no evidence of any course of dealing between them, which authorized the collecting bank to appropriate the proceeds of collection and make itself a mere debtor of the owner of the draft, or to send its check in settlement. If the check sent had been paid, this, of course, would have settled the matter; but, when it was not paid, the owner of the draft was entitled to the proceeds of collection, if they could be traced into the funds which

came into the hands of the receiver. Holder v. Western German Bank (C. C. A. 6th) 136 F. 90; American Can Co. v. Williams (C. C. A. 2d) 178 F. 420; Spokane & Eastern Trust Co. v. U. S. Steel Products Co. (C. C. A. 9th) 290 F. 884; Larabee Flour Mills v. First National Bank of Henryetta, Okl. (C. C. A. 8th) 13 F.(2d) 330; Manufacturers' National Bank v. Continental Bank, 148 Mass. 553, 20 N. E. 193, 2 L. R. A. 699, 12 Am. St. Rep. 598.

[2] Furthermore, there can be no question, we think, that the collecting bank was insolvent at the time it made the collection. The record shows that the check of Chandler, Inc., given in payment of the draft, was stamped paid on March 25th, and on that very day the bank closed its doors, because, as complainant alleges and defendants admit, it had become "unable to meet the demands of depositors and creditors" and "found it impossible to continue its said banking business." This being true, the trust in the proceeds is supported upon another ground; for it is universally held that the insolvency of a collecting bank at once terminates its authority to proceed further, and if collections are afterwards made, or those previously undertaken are completed, the proceeds are held in trust for the owner, and can be collected from the receiver if they have come into his possession. 7 C. J. 625, 626; 3 R. C. L. 635; Western German Bank v. Norvell (C. C. A. 5th) 134 F. 724; First National Bank of Ventura v. Williams (D. C.) 15 F.(2d) 585, and cases there cited. In that case it is said:

"Where, however, the collecting bank is insolvent at the time of the collection, the authority of the bank to collect the draft and mingle the proceeds with its general assets does not exist, and the proceeds of the collection may be recovered from the receiver of the insolvent bank, if they can be identified in his hands [citing cases]. Even deposits, when received by a bank hopelessly insolvent, to the knowledge of its officers, may be recovered, if they can be traced into the hands of the receiver [citing cases]. And for a stronger reason may one who has forwarded a draft for collection recover the proceeds of the collection if they can be traced or identified; for in such case the money has come into the hands of the collecting bank because of the fiduciary relationship which exists between it and the forwarder. Where the collecting bank, being insolvent to the knowledge of its officers, proceeds to collect the draft and appropriate the proceeds, this is such a fraud on the forwarder as justifies him in repudiating the transaction and recovering the proceeds of the collection, if he can identify them."

[3] But the owner of a draft collected by an insolvent bank is not entitled to have a trust declared on assets in the hands of its receiver, or to preferential payment therefrom, unless he is able to trace the proceeds of the collection into the hands of the receiver, or to show that the assets which have come into his hands have been directly augmented as a result thereof. First National Bank of Ventura v. Williams, supra; Farmers' National Bank v. Pribble (C. C. A. 8th) 15 F. (2d) 175; Empire State Surety Co. v. Carroll County (C. C. A. 8th) 194 F. 593; American Can Co. v. Williams (C. C. A. 2d) 178 F. 420; Richardson v. New Orleans Debenture Redemption Co. (C. C. A. 5th) 102 F. 780; City Bank of Hopkinsville v. Blackmore (C. C. A. 6th) 75 F. 773; Frelinghuysen v. Nugent (C. C.) 36 F. at page 239.

This brings us to the principal question in the case, viz.: Has complainant traced the proceeds of the collection into the hands of the receiver or shown that the assets which came into his hands were directly augmented as a result thereof? We think that it has.

[4, 5] In ordinary cases, of course, the receipt by the collecting bank of a check drawn against the account of one of its depositors does not bring anything into the bank, and cannot be said to augment in any way assets passing into the hands of the receiver. It is a mere shifting of credits. Larabee Mills v. First Nat. Bank (C. C. A. 8th) 13 F.(2d) 330; American Can Co. v. Williams (C. C. A. 2d) 178 F. 420; North Carolina Corp. Com. v. Merchants' & Farmers' Bank, 137 N. C. 697, 50 S. E. 308. But the case presented by the record here is not an ordinary case of shifting of credits. In the first place, it appears that, at the time Chandler, Inc., gave the check in payment of the draft, it deposited with the bank funds amounting to $3,418.35, included among which were checks on out of town banks aggregating $2,471, which were subsequently collected by the receiver. It is a fair inference that the deposit in question was made for the purpose of meeting the draft, for the balance prior to the deposit was only $17.92, and the other two checks drawn before the failure of the bank amounted to only $282.-70. Equity regards substance, and not form, and in substance the deposit, which included checks on out of town banks which brought $2,471 into the hands of the receiver after he had taken over the bank's assets, was

made to meet the draft which the bank held for collection. We do not think that, under these circumstances, the right of the owner of the draft to the funds realized from these checks should be defeated merely because Chandler, Inc., deposited the checks to its credit and gave a check against the credit, instead of indorsing them over as direct payment on the draft.

[6] And, in another view of the case, we think that the collection of the draft resulted in augmenting the assets which came into the hands of the receiver, not merely by the amount of these out of town checks collected by the receiver, but by the entire amount of the check which Chandler, Inc., gave in payment. Prior to the giving of the check, Chandler, Inc., had executed its note to the collecting bank for $15,000. This note, as above stated, was good and collectible; and, although it had been pledged with other collateral to the Federal Reserve Bank, it belonged to the bank subject to this pledge. The other collateral was of a value greatly in excess of the amount due the pledgee; and all of it, including this note, was subsequently redeemed by the receiver or for his benefit, and in his hands the note was subject to a set-off in favor of Chandler, Inc., for the deposit to its credit at the time of the bank's failure.

Now, the charging to Chandler, Inc.'s account of the check for $2,899.77 had reduced this deposit to $253.80, and the note was collected from Chandler, Inc., in full, less the amount of this deposit. If the check had not been charged to the account of Chandler, Inc., the deposit would have been greater by the amount of the check, and just that much less could have been collected on the note. Can there be any doubt, therefore, that the collection of the check augmented the assets which came into the hands of the receiver, in that it enabled him to collect just that much more on the note? The check was used by the bank to reduce the deposit account, and when the receiver allowed only $253.80 by way of set-off he relied upon the check to reduce the deposit account to that figure. To state the matter in another way, the note, which was an asset that came into the hands of the receiver, was worth more than it would otherwise have been worth by exactly the amount of the check, as a result of the check having been given to the bank and charged against the Chandler account.

[7] The old rule with regard to the tracing of trust funds wrongfully misapplied, or the proceeds of property wrongfully converted, was that the right ceased when the property was turned into money and mixed or confounded in the general mass of property of the same description. 2 Story, Eq. Jur. 1258, 1259; Philadelphia Nat. Bank v. Dowd (C. C.) 38 F. 172, 2 L. R. A. 480. The modern rule of equity, however, is that, "where the fraudulent depositary so mingles goods which he has obtained by fraud with the mass of like goods of his own, the whole may be seized, or considered as held in trust, until equitable separation of the property of the defrauded party is made. So, advancing one step further, where money thus obtained has gone to swell the aggregate in the possession of the fraudulent party, it may, under proper proceedings, be segregated in amount from such aggregate sum, and made the subject of a trust, in order to accomplish the ends of justice." Gray, J., in Quin v. Earle (C. C.) 95 F. 731. See, also, Central National Bank v. Conn. Mut. Life Ins. Co., 104 U. S. 54, 26 L. Ed. 693; Knatchbull v. Hallett, 13 Ch. Div. 696, and notes in 32 Am. St. Rep. at page 129, and L. R. A. 1916C, at page 31.

In Central National Bank v. Conn. Mut. Life Ins. Co., supra, Mr. Justice Matthews, in the course of a learned opinion in which the subject is fully treated, quotes with approval the following statement of Lord Justice Turner in Pennell v. Deffell, 4 De G., M. & G. 372, 388:

"It is, I apprehend, an undoubted principle of this court, that as between cestui que trust and trustee and all parties claiming under the trustee, otherwise than by purchase for valuable consideration without notice, all property belonging to a trust, however much it may be changed or altered in its nature or character, and all the fruit of such property, whether in its original or in its altered state, continues to be subject to or affected by the trust."

And further, in the same opinion, in discussing the decision in Knatchbull v. Hallett, supra, Mr. Justice Matthews said:

"The Master of the Rolls, Sir George Jessel, showed that the modern doctrine of equity, as regards property disposed of by persons in a fiduciary position, is that, whether the disposition of it be rightful or wrongful, the beneficial owner is entitled to the proceeds, whatever be their form, provided only he can identify them. If they cannot be identified by reason of the trust money being mingled with that of the trustee, then the cestui que trust is entitled to a charge upon the new investment to the extent of the trust money traceable to it; that there is no distinction between an express trustee

and an agent, or bailee, or collector of rents, or anybody else in a fiduciary position; and that there is no difference between investments in the purchase of lands, or chattels, or bonds, or loans, or moneys deposited in a bank account. He adopts the principle of Lord Ellenborough's statement in Taylor v. Plumer, 3 M. & S. 562, that 'it makes no difference in reason or law into what other form different from the original the change may have been made, whether it be into that of promissory notes for the security of money which was produced by the sale of the goods of the principal, as in Scott v. Surman, Willes, 400, or into other merchandise, as in Whitecomb v. Jacob, 1 Salk. 161; for the product or substitute for the original thing still follows the nature of the thing itself, as long as it can be ascertained to be such, and the right only ceases when the means of ascertainment fail.' "

In City Bank v. Blackmore, supra (C. C. A. 6th) 75 F. 771, the court had under consideration a case involving a draft sent for deposit to an insolvent bank, which used same to reduce its indebtedness to one of its correspondents. A preference was denied, as it did not appear that the draft in any way added to the assets of the insolvent bank, but merely reduced its liabilities. The court clearly recognized, however, that if the draft had added to the assets of the insolvent bank which came into the hands of the receiver, or had reduced its liabilities in such way that there was that much more for division among creditors, the claim of preference would have been allowed. Judge (now Chief Justice) Taft, speaking for the court, said:

"The sole question is, therefore, whether the credit thus secured to the Commercial Bank and its receiver by the draft entitles the City Bank to take $5,000 out of the assets held by the receiver. The question must certainly be answered in the negative, in any view which can be taken, unless it appears that the assets were increased $5,000 by the credit, or that the claims against them were so decreased that there was $5,000 more for distribution among those who remained creditors after the credit than there would have been had no credit been given to the Commercial Bank for the draft."

[8] Applying the criterion laid down in that case to the facts of the case at bar, there can be no doubt that, as a result of the collection of the draft of complainant, the assets which came into the hands of the receiver were greater by the amount of the collection than they would have been had the collection not been made, and consequently that

there was exactly that much more for division among creditors than there would have been otherwise. The receiver, relying upon the line of cases of which Empire State Surety Co. v. Carroll County, supra, is typical, contends that the right of a cestui que trust to preferential payment is dependent upon his being able to show that the trust property or its proceeds went into a specific fund or into a specific identified piece of property which came into the hands of the receiver; but we think that even this test has been met in this case. When it is shown that the receiver relied upon the check received in payment of claimant's draft to reduce the deposit account which was a valid set-off to the note of Chandler, Inc., and was thereby enabled to collect on the note $2,899.77 more than he would have been able to collect otherwise, it would seem that the proceeds of the collection have been pretty accurately traced into the funds derived from the collection of the note.

[9, 10] And we do not think that it makes any difference that the note had been pledged to the Federal Reserve Bank and was held by it as security at the time the bank failed. Of course, if the note had been collected by that bank as pledgee, the deposit of Chandler, Inc., could not have been set off against it; and, in that case, the receipt of the check by the bank would not have increased the value of any asset coming into the hands of the receiver; but that is not the case here. The note was not collected by the Federal Reserve Bank, but by the receiver; and, as shown above, the fact that the check had been given to the bank did enable the receiver to collect $2,899.77 more than he could have collected otherwise. Even though the note was held under a pledge at the time of the bank's failure, as soon as it was redeemed by the receiver it became subject in his hands to a set-off to the extent of the deposit standing to the credit of the maker upon the books of the bank, just as though it had never been pledged. Williams v. Burgess, 74 W. Va. 623, 82 S. E. 507, Ann. Cas. 1917C, 1185; 7 C. J. 653. See, also, Scott v. Armstrong, 146 U. S. 499, 13 S. Ct. 148, 36 L. Ed. 1059; Yardley v. Clothier (C. C.) 49 F. 337. The rule that the rights of the parties become fixed when the bank closes its doors means that a debtor of the bank cannot set off a claim acquired after insolvency against a debt contracted before. It does not mean that he cannot set off his deposit against a note owned by the bank and collected by its receiver merely because at the time of the bank's failure the note

was held by another bank to which it had been pledged as collateral.

We have carefully considered the able brief of counsel for the receiver, but we think that the decision of the District Judge was correct, and same is accordingly affirmed.

Affirmed.