**SOUTH CAROLINA NAT. BANK OF CHARLESTON v. McCANDLESS.**
No. 3022.

Circuit Court of Appeals, Fourth Circuit.
Oct. 21, 1930.

F. H. Horlbeck, of Charleston, S. C. (Julian Mitchell, of Charleston, S. C., on the brief), for appellant.

R. E. Whiting, of Columbia, S. C. (M. S. Connor, of St. George, S. C., on the brief), for appellee.

Before PARKER and NORTHCOTT, Circuit Judges, and SOPER, District Judge.

PARKER, Circuit Judge.

This is an appeal in an action at law instituted in the court below by the receiver of the First National Bank of St. George, S. C., against the South Carolina National Bank of Charleston, S. C., to recover a deposit of $12,852.46. The Charleston bank admitted liability for the sum of $587.50, and paid same without prejudice. It claimed the right to set off against the deposit two checks of the St. George bank aggregating $1,772.59 which it had paid before notice of insolvency; and this right was conceded by the receiver upon the trial. As to the remaining $10,492.37, it claimed the right to charge against this a check of like amount drawn on the St. George bank by the Dorchester Lumber Company, which it had credited to the account of the lumber company, and forwarded to the bank for collection. The trial judge directed a verdict for the receiver, and from judgment thereon the Charleston bank has appealed.

The facts are that the St. George bank was closed by the bank examiner because of insolvency on the morning of Monday, April 2, 1928. The check in question was drawn by the Dorchester Lumber Company on the St. George bank in favor of the South Carolina Security Company, and bore date of March 29, 1928. It was deposited in the Charleston bank, by that bank was charged to the account of the St. George bank, and was forwarded to the latter for collection on Satur-

day, March 31st. Attached to it was a slip requesting that, if not paid, the St. George bank wire the Charleston bank to that effect. It reached the cashier of the St. George bank on Sunday about noon. He opened the letter containing it and placed it on a spindle file on the counter of the bank, where it was found next day by the bank examiner. It was not marked paid, charged to the account of the drawer or credited to the Charleston bank; and nothing was done showing that it was accepted for payment or that payment was intended. After finding it, the bank examiner called the Charleston bank over the telephone and was directed by the vice president of that bank to have it protested. This was done, and it was returned to the Charleston bank on April 4th.

For several days prior to April 2d, the St. George bank had been in a precarious financial condition. Its directors had been trying to obtain funds to keep it in operation; but on the Friday and Saturday preceding it had failed to pay checks presented through the Federal Reserve Bank, and a representative of that bank arrived on the scene on Saturday. On Sunday, efforts to obtain additional funds definitely failed; and at half past 4 o'clock Monday morning the cashier called the bank examiner, who was in a nearby town, and asked him to come over and take charge. The bank opened for business on Monday morning and stayed open for a short while, but deposits received were kept separate from the general funds of the bank. Several checks presented by the representative of the Federal Reserve Bank were paid, but this payment was later recovered as preferential. A run being threatened, the doors of the bank were closed; and shortly before noon the examiner arrived and took charge.

There was evidence that, on the Thursday preceding the closing, an official of the lumber company notified the cashier that the check in question had been drawn, and there was some evidence that the cashier promised to have funds in Charleston to meet it. There was evidence also that, because of this promise, the lumber company refrained from withdrawing money for its pay roll, amounting to about $7,000. At the time the check was received by the St. George bank the deposit of the lumber company was more than sufficient to meet it. When it was forwarded for collection on Saturday, the St. George bank did not have a sufficient deposit with the Charleston bank to pay it, but items forwarded that day increased its deposit to an amount more than sufficient.

The principle is well settled that the payee or holder of a check has no claim against the bank upon which it is drawn. The bank's debt is solely to its depositor. Farmers' & Merchants' Bank of Monroe v. Federal Reserve Bank, 262 U. S. 649, 659, 43 S. Ct. 651, 67 L. Ed. 1157, 30 A. L. R. 635; Civ. Code of South Carolina, section 3840. The Charleston bank, therefore, acquired no right against the St. George bank when it received the check in question for deposit. When the St. George bank received it, that bank had the right to determine whether to pay it or not, and to refuse payment for any reason or for no reason. Columbia-Knickerbocker Trust Co. v. Miller, 215 N. Y. 191, 109 N. E. 179, Ann. Cas. 1917A, 348.

There is no evidence that the check was paid. It was not credited to the forwarding bank or charged to the lumber company. There was no evidence of any action on the part of the bank officials showing payment; and, on the first business day following its receipt on Sunday, the forwarding bank was notified over the telephone of its nonpayment, and requested that it be protested. Furthermore, the insolvency of the St. George bank and the fact that its officers knew that it was to be placed in the hands of the bank examiner within a few hours, prevented its either collecting the check for the forwarding bank or paying it for its depositor. The insolvency of a collecting bank at once terminates its authority to proceed further with a collection. Ellerbe v. Studebaker Corporation of America (C. C. A. 4th) 21 F. (2d) 993, 995. And where the officers of the bank knew that the examiner was shortly to take charge and that payment of the check would result in a preference, they had no right to make such payment. R. S. § 5242, 12 USCA § 91; 3 R. C. L. 646.

And the fact that the check was charged to the St. George bank on the books of the Charleston bank does not affect the rule as stated, even though such charge may have been made pursuant to custom. That it was purely tentative, a mere matter of bookkeeping, is shown by the fact that attached to the check was a memorandum requesting that the St. George bank wire if it was not paid promply. And the fact that it was sent in ordinary course for collection, and not as an item chargeable as of right against the St. George bank, is shown by the direction given the bank examiner that it be protested for nonpayment and by the letter of the cashier of the Charleston bank to the bank examiner on April 5th, wherein he stated: "Our rec-ords show that this check was received on deposit by us on March 31, 1928, and on that date dispatched by regular mail for collection and credit to our account." Of course, it was not to be credited unless collected; and, as shown above, the St. George bank could not properly have collected it, because of its known insolvency.

It is held that, notwithstanding clearing house entries, charging checks against banks upon which they are drawn, the question of payment is not ultimately decided until the drawee bank has had opportunity to examine the check at its banking house. Columbia-Knickerbocker Trust Co. v. Miller, supra; Eastman Kodak Co. v. National Park Bank (D. C.) 231 F. 320, 324; Id. (C. C. A.) 247 F. 1002. As said by Judge Learned Hand in the case last cited: "Payment is a matter of intent, and it seems to me quite clear that the mere entry of the items upon a sheet in the clearing house is not intended as a payment. * * * Had the National Park Bank refused to honor the check willfully and for no reason whatever, no liability would have attached to it." A fortiori payment does not result nor liability attach because the forwarding bank has charged the check to the drawee upon its books.

There is nothing contrary to this in Early v. Federal Reserve Bank, 281 U. S. 84, 50 S. Ct. 235, 74 L. Ed. 718; Id. (C. C. A. 4th) 30 F. (2d) 198, 199. In that case the Federal Reserve Bank had forwarded checks to a drawee member bank subject to the terms of a contract, which provided that the amounts thereof should be chargeable against the account of the drawee at the end of the transit time, but might be so charged at any time deemed necessary by the Reserve Bank. The checks were received by the drawee bank and duly charged against the accounts of depositors. It was held that under the terms of the agreement the amount of the checks was chargeable against the account of the drawee in the Reserve Bank and that such account was subject to an equitable lien for their payment. That case did not hold, however, that there was any right on the part of the Reserve Bank to charge against the account of the drawee any check which had not been paid by the drawee or that until so paid there was any lien therefor on the account of the drawee with the Reserve Bank. On the contrary, this court said in that case: "The checks were forwarded by the Reserve Bank to the insolvent bank under an agreement that they should be charged against its account at the expiration of three days, unless returned

immediately. They were so sent because the owners, for whom the Reserve Bank was acting as agent, had consented to the arrangement. As a substitute for the right to have them presented through another bank and collected in cash, the owners had agreed that they be sent direct to the drawee, under the agreement that, if not promptly returned, they be charged against the drawee's reserve balance. When, therefore, they were accepted by the drawee, the owners had the right to demand that they be charged against the drawee's account, and that the balance in that account be applied by the Reserve Bank to their payment. The only question that can arise is: *When does this right of the owners of the checks become fixed, so as to constitute it a charge upon the reserve balance? We think that it becomes so fixed when the drawee bank, either unequivocally accepts the checks, as in this case, or, by failing to return them promptly, becomes chargeable with them under the terms of the agreement.*" (Italics ours.)

■ We see nothing in the contention that the St. George bank or its receiver is estopped to deny payment because of failure to notify the Charleston bank that the check had not been paid, or because of the alleged agreement to have funds in Charleston to meet it. The St. George Bank failed on the first business day after the check was received on Sunday; there was no time after its arrival when the bank, in view of its known insolvency, would have been justified either in collecting or paying it; and within twenty-four hours after its receipt the Charleston bank was notified that it had not been and would not be paid. So far as the agreement is concerned, it is clear that an agreement to have funds to pay a check at a distant point could no more estop a bank to deny payment, where payment had not actually been made, than could an agreement to have funds for its payment at its own banking house, which, of course, is the agreement which every bank impliedly makes with all of its depositors as to checks drawn against deposits.

The failure to obtain payment of the check was not due to anything contained in the agreement, or to anything resulting therefrom, but to the fact that the check, as drawn by the lumber company and accepted by the Charleston bank, was payable, not at Charleston, but at St. George. The lumber company might have obtained a cashier's check from the St. George bank drawn against funds in Charleston, and this would have given point to the agreement to have funds in Charleston to meet it; but, instead of doing this, it drew an ordinary check against its account in the St. George bank, which upon its face was payable at that bank and must necessarily have been presented at the banking house of that bank before it could be paid. Failure to obtain payment resulted, not from failure of the St. George bank to have funds in Charleston, but from the fact that that bank became insolvent before the check could be presented for payment in accordance with its terms.

The argument on behalf of appellant on the question of estoppel is in reality an argument that the deposit in the Charleston bank was subject to an equitable lien for the payment of the check in controversy because of the alleged agreement. This defense was not properly pleaded, but if it had been, it could not be sustained. There is nothing in the evidence which by any possibility could be construed as an assignment of the deposit, as there was in Fourth Street Bank v. Yardley, 165 U. S. 634, 17 S. Ct. 439, 41 L. Ed. 855, upon which appellant relies; there was no agreement that the check should be charged against the deposit of the St. George bank with the Charleston bank; and there was no agreement to vary in any way the obligation which it owed as to any check drawn by a depositor, i. e., the obligation to pay it in cash at its counter when properly presented.

■ Even if what was said be construed as an agreement on the part of the St. George bank that the check be paid from funds in Charleston, this would not constitute it a lien upon the deposit in the Charleston bank. In the first place there was no designation of this deposit as the fund from which the check was to be paid; and, in the second place, even if there had been such designation, there was no setting apart of any funds to pay same. See Pomeroy's Equity Jurisprudence (4th Ed.) § 1325; Christmas v. Russell, 14 Wall. 69, 20 L. Ed. 762; Smedley v. Speckman (C. C. A. 3rd) 157 F. 815; Equitable Trust Co. v. First Nat. Bank of Trinidad, 275 U. S. 359, 48 S. Ct. 167, 168, 72 L. Ed. 313.

The case of Equitable Trust Co. v. First Nat. Bank of Trinidad, supra, is, we think, directly in point. In that case the Trinidad bank had drawn a draft on a bank in Italy and had arranged with New York bankers to provide the drawee with funds for honoring it, sending them funds for that purpose. The New York bankers had an account with the Italian bank, but no funds were designated out of which the draft of the Trinidad bank was to be paid. Upon the bankruptcy of the New York bankers, the Italian bank refused

to pay the drafts which they had guaranteed, and their trustee in bankruptcy collected the balance to their credit in the Italian bank. It was held that the Bank of Trinidad had no right in or lien upon this balance, although its draft was to be paid by the Italian bank and charged to the account of the New York bankers. What was said by Mr. Justice Holmes, speaking for the Court in that case, tersely answers the contention which is made here. Said he: "Again, the terms offered by the bankrupts to their correspondents seem to us to promise the appropriation of a specified fund to the draft as little as they promise to apply the money received by them to that end. They are to provide the drawee banks with sufficient funds for the payment of the drafts by transfer of credit from our balance 'or otherwise.' They are to provide, that is, as convenient to themselves, for payment by the drawee banks, not to give them an earmarked corpus to be handed over."

Here, even if the promise to the lumber company be construed as an agreement that the check should be paid from funds in Charleston, there was no appropriation of a specified fund to that purpose and no corpus was earmarked to be handed over. There was nothing more than an agreement that the check might be charged against its balance, if paid, which was precisely the situation in the Bank of Trinidad Case, where it was held that such balance was not charged with a lien for the payment of the draft.

There was no error, and the judgment of the lower court will be affirmed.

Affirmed.