[No. 17216. Department One. November 3, 1922.]

L. G. RAYNOR et al., Appellants, v. SCANDINAVIAN-AMERICAN BANK et al., Respondents.[1]

NEW TRIAL (43)—TIME FOR MOTION. Under Rem. Comp. Stat., § 402, a motion for a new trial in an action tried without a jury is timely if given on learning of the decision, in the absence of written notice of the decision.

APPEAL (114)—PRESERVATION OF GROUNDS—OBJECTIONS—PARTIES. Objection to a misnomer of defendants cannot be made for the first time in the supreme court, upon an appeal in an action to determine the right to deposits in an insolvent bank in the hands of the state supervisor of banking for liquidation, where the action was brought against one H. as a bank commissioner in charge, and defended by him without interference by his superior officer.

ESTOPPEL (23)—EQUITABLE ESTOPPEL—PREJUDICE. Depositors in an insolvent bank are not estopped by the filing of general claims from asserting the right to a preference over general creditors, where no one has been misled to his prejudice.

BANKS AND BANKING (23) — DEPOSITS — PAYMENT OF CHECKS — RIGHT TO COUNTERMAND. Although a check does not operate as an assignment of the funds in bank, and may be countermanded at any time before acceptance, payment in good faith constitutes acceptance and defeats a subsequent countermand.

[1]Reported in 210 Pac. 499.

SAME (23). The payment of checks presented by the liquidating officer of an insolvent bank, when presented at 8:30 o'clock before usual banking hours, does not thereby appear to have been in bad faith, leaving the checks subject to countermand; especially where it appears that it was the usual custom of banks in that city to engage in such transactions between banks outside of the ordinary business hours.

SAME (20, 31)—DEPOSITS FOR COLLECTION—CHECKS—TITLE. A condition on a deposit slip that, if the check deposited was not found good at the close of business on the day of the deposit, it could be charged back, did not constitute it a deposit for collection, or prevent the bank from paying the check so that it could not be thereafter countermanded.

SAME (6, 8)—INSOLVENCY—FRAUD—DEPOSITS AFTER INSOLVENCY— LIABILITY. Where a bank remains open and receives deposits after it knows that it is hopelessly insolvent, depositors may recover the deposits as induced by fraud.

SAME (6)—IMPUTED NOTICE. Knowledge of the hopeless insolvency of a bank is imputed to the bank where it was known to the officers and agents charged with the direction and management of its affairs.

SAME (7, 8, 27)—INSOLVENCY—ASSETS—DEPOSITS AFTER INSOLVENCY—COMMINGLED FUNDS—RIGHT OF RECOVERY. Where checks and drafts, deposited in an insolvent bank through the fraud of the bank after knowledge of its insolvency, came into the hands of the bank commissioner in charge of the liquidation, and were capable of identification, the depositors could recover from the bank commissioner the amount which he had collected thereon and thereby augmented the net assets of the company.

SAME (5-9)—INSOLVENCY—POWERS OF OFFICERS—STATUTES. The insolvency of a bank does not depend upon its being closed by the bank commissioner, in view of Rem. Comp. Stat., § 3779, providing that the officers of a bank may close it for insolvency, and Id., § 3288, making it a felony to receive deposits knowing the bank to be insolvent.

PLEADING (33)—JUDGMENT (63)—COMPLAINT—PRAYER—RELIEF— CONFORMITY TO PLEADING. Where a complaint states the facts and issue was joined and proofs taken, the court has power to grant relief in the form warranted by the proofs, although recovery was asked upon an incorrect theory.

BANKS (7, 8)—INSOLVENCY—ASSETS AND LIABILITIES. Where a bank, upon receiving, while insolvent, liberty bonds for exchange,

gave the depositor credit for their face value until the other securities could be obtained, the bonds or their value could be recovered of the bank commissioner in charge of the liquidation, either as owner of the bonds or as *cestui que trust.*

Cross-appeals from an order of the superior court for Pierce county, Card, J., entered December 28, 1921, granting a new trial as to one cause of action and denying it as to the other, after a judgment rendered in favor of the plaintiffs, in an action to determine the title to a bank deposit, tried to the court. Reversed on plaintiffs' appeal; affirmed on defendants' appeal.

*L. B. da Ponte,* for appellants.

*Guy E. Kelly, Thomas MacMahon,* and *F. D. Oakley,* for respondents.

FULLERTON, J. —The controversy in this cause has its origin in the insolvency of the Scandinavian-American Bank of Tacoma. On Saturday, January 15, 1921, certain employees of the Northern Pacific Railway Company severally deposited with the bank named their pay checks that day received from the railway company. The checks were drawn on the National Bank of Tacoma, and were listed by the receiving bank, when the deposits were made, on deposit slips in general use by the bank. Each slip contained the following stipulation printed on its margin:

"Checks on this bank and on other Tacoma clearing house banks will be credited conditionally. If not found good at the close of business, they will be charged back to depositors and the latter notified of the fact. In making this deposit the depositor hereby assents to the foregoing conditions."

On the day the deposits were made, and before the checks were cashed by the bank, the bank was taken in charge by the state bank commissioner because of

its insolvent condition, and placed in the immediate control of one Forbes P. Haskell for liquidation. On the next business day, namely, Monday, January 17, 1921, at about 8:30 o'clock in the morning, the person in charge of the bank took the checks to the payor bank, presented them for payment, and received a credit as such liquidator on the books of that bank for the total amount of the checks. Later on in the same day, but before the opening of the payor bank for general business, the drawers of the checks and the several payees thereof endeavored to stop their payment by notifying the bank, both orally and in writing, not to pay them. The bank, because it had prior thereto honored the checks, refused to recognize the right of the parties to stop payment, and so informed them. Thereupon, pursuant to an agreement participated in by all of the parties, the proceeds were left with the payor bank until such time as it could be determined by court procedure which of the parties were entitled to the fund.

Later on the payees of the checks assigned in writing to L. G. Raynor and R. F. Graham all their right, title and interest in the subject-matter of the controversy, who thereupon instituted the present action to determine the ownership of the fund, naming as defendants in the action the National Bank of Tacoma, the Scandinavian-American Bank and Forbes P. Haskell, the person specially in charge of the liquidation of the insolvent bank, but did not name as a defendant the bank commissioner.

The several payees of the checks had, at the time of the deposit of the checks with the bank, a deposit account therein, which the credit given for the checks augmented. Subsequently, but whether before or after the assignments to the plaintiffs were made the evi-

dence is not very clear, the several payees presented to the commissioner liquidating the bank claims for the amount of their total balances. These were allowed by the commissioner as general claims. Included in the complaint, as a second cause of action, was a claim to certain liberty bonds, the facts concerning which we will later state.

The action was tried by the court sitting without a jury. At the conclusion of the evidence, the National Bank of Tacoma was dismissed from the action. Judgment was entered against the defendant Haskell, as bank commissioner having in charge the liquidation of the bank, on both causes of action. No mention was made of the defendant Scandinavian-American Bank. The defendant Haskell thereupon moved for a new trial, which motion was granted as to first cause of action, but denied as to second. The plaintiffs appeal from the order in so far as it grants a new trial, and the defendants Scandinavian-American Bank and Haskell appeal from the entire judgment and from the order refusing to grant a new trial as to the second cause of action.

Before passing to the merits of the controversy, certain preliminary objections must be noticed. The plaintiffs contend that the order granting the new trial must be reversed and the cause remanded with instructions to reinstate the original judgment without a consideration of the merits of the order. The contention is founded on the claim that the motion for a new trial came too late and that the court was thus without jurisdiction to entertain it. But in actions tried by the court without a jury, the motion is in time if made within two days after notice in writing of the decision of the court. Rem. Comp. Stat., § 402. Here, notice in writing of the decision of the court

was not given, and the defendants learned of it on the third day after its rendition and entry. They filed and served their motion on the day following the day they learned of the rendering of the decision, and we hold it to be timely made.

The defendants complain that there is a misjoinder of parties to the action. The complaint, as we have before stated, named as parties defendant the Tacoma National Bank, the insolvent bank, and the officer specially in charge of the liquidation of the insolvent bank. It is contended that the supervisor of banking is also a necessary party, and that the omission to make him such is fatal to any form of recovery which affects the assets of the insolvent bank. But we cannot think the contention well founded. The objection is made in this court for the first time. In the court below, the officer specially in charge of the bank, and who was made a defendant, defended as the representative of the insolvent bank and of the state banking department without suggesting a want of authority, and without interference by his superior officer, who must have known of his action. The objection now comes too late.

The defendants make the further objection that the plaintiffs are estopped from asserting a special claim for the amount of the checks against the insolvent bank, for the reason that their assignors included such amount in their general claims filed with the liquidating officer of the bank. But this act alone is insufficient to constitute an estoppel.

"It is fundamental that a party relying upon an estoppel must show that he has been prejudiced by the act of the party whom he is seeking to estop. Estoppels operate only towards parties or privies, and the party who pleads an estoppel must be one who has in good faith been led to his injury." *Butler v.*

*Supreme Court of Foresters,* 53 Wash. 118, 101 Pac. 481, 26 L. R. A. (N. S.) 293.

There was here no misleading nor injury. Neither party changed his course of dealing because of the nature of the claims. The money still remained impounded, and the controversy over it continued until it finally culminated in the present action. It is true there is no direct evidence that the amount of the checks was included in the claims by mistake or inadvertence, but this was not a necessary showing to prevent an estoppel. The showing that there was no change in the relation of the defendants with reference to the checks to their disadvantage is sufficient. The precise question was determined in *Wuerpel v. Commercial Germania Trust & Sav. Bank,* 238 Fed. 269, 151 C. C. A. 285, where it was held that a creditor by filing a general claim and receiving dividends thereon is not estopped from asserting a right to a preferential payment, in the absence of a showing of prejudice.

As grounds for reversing the order granting a new trial, the appellants make three principal contentions: (1) That the checks were wrongfully paid by the National Bank of Tacoma, because paid before the hour of the day the bank was usually opened to the public for the transaction of business, and because before that hour a stop-payment order had been given the bank; (2) that because of the condition attached to the deposit of the checks, as expressed on the deposit slips, the bank never had title to the checks; that, in consequence, the bank commissioner had no title to or right to collect them, and that, when he did so, the proceeds of the collection remained the property of the depositors and did not become assets of the insolvent bank; and (3) that, if it be found

that the stop-payment order was not in time, and it
be held that the bank acquired title to the checks by
the deposit, then the bank became the trustee of the
depositors *ex maleficio* on the receipt of the checks,
because of the fraud practiced upon them by the bank
officers in receiving the deposits after they had knowl-
edge of the bank's insolvent condition, and knowledge
that it must be closed and liquidated because of such
insolvent condition.

Noticing the first of the contentions made, it is a
general rule, since a check upon a bank does not
operate as an assignment of any part of the funds
to the credit of drawer with the bank, and since the
bank is not liable to the holder unless and until it
accepts or certifies the check, that the drawer of the
check may countermand its payment at any time before
it is accepted or certified, taking upon himself the
consequences of the act. Payment of the check in
good faith by the bank constitutes an acceptance, and
the bank, of course, cannot be charged by an order
of countermand made after such payment. In the
instance case, the court found, and the evidence shows,
that payment of the checks here in question was made
by the bank prior to the time the drawer of the checks
countermanded their payment, and it is not shown that
there was any actual bad faith on the part of the bank
in so doing. Indeed, actual bad faith is not seriously
urged, but it is urged that, since the bank made the
payments prior to the time it opened for the trans-
action of its general business, the payment was so
far irregular as to rob the transaction of its good
faith, in legal effect, and leaves the checks subject
to countermand at any time before it did so open.
But with this contention we cannot agree. The courts,
of course, recognize that it is the custom of banks

to have regular business hours, and, where these hours are reasonable, it will not ordinarily place a bank in default for refusing to deal with a customer outside of such business hours. But neither the custom of the bank nor the principle of law stated fixes any hard or fast rule as to the time a bank may transact its ordinary business. If it chooses to transact such business either before or after its usual business hours, the transaction is not for that reason alone illegal. It has the effect of a transaction had during the usual business hours, and must be impeached, if impeached at all, for some reason apart from the hour of its transaction. But more than this, it was shown that it was usual and customary for banks located in the city where this bank was located to engage in transactions of this sort outside of the ordinary business hours, especially where one bank was dealing with another. Since the business of conducting a bank is affected with a public interest, statutory regulation fixing the hours within which a bank may transact its ordinary business are recognized by the courts as obligatory. In this jurisdiction, however, there is no such statute.

The second of the contentions is, we think, also without foundation. The condition written on the deposit slips amounted to nothing more than an agreement between the bank and each of the several depositors that, if the check deposited was not found to be good at the close of business on the day of the deposit, it could be charged back to the depositor. Such an agreement we held in *Vickers v. Machinery Warehouse & Sales Co.*, 111 Wash. 576, 191 Pac. 869, did not constitute a deposit for collection, but was a sale of the paper to the bank and passed title to the paper, subject only to the right of rescission if the

paper subsequently proved to be without value. In that case we said:

"It has been argued that the fact that the Chicago bank took this draft considering that it had the right to charge the same back to the machinery company if it were not paid, shows that the bank did not become the absolute owner of the draft; that it could not maintain the dual position of being the absolute owner and at the same time reserve the right to charge back if the draft were not paid. This argument is fully answered by the supreme court of the United States in *Burton v. United States, supra,* when it says: 'The testimony of Mr. Brice, the cashier of the Riggs National Bank, as to the custom of the bank when a check was not paid, of charging it up against the depositor's account, did not in the least vary the legal effect of the transaction; it was simply a method pursued by the bank of exacting payment from the indorser of the check, and nothing more.' "

The third contention is of more moment. Notwithstanding the defendants' claim to the contrary, we think the evidence conclusively shows that the bank receiving the checks as a deposit was hopelessly and irretrievably insolvent at that time, and was then known to be so by its managing officers; and that it conclusively shows, also, that none of the several depositors of the checks had knowledge of such insolvency at the time of the deposit. The question then is, is the receipt of a deposit by a bank under such circumstances such a fraud upon the depositor as to permit the depositor to rescind the transaction. We think the question must be answered in the affirmative. The keeping of a bank open in the usual manner for the transaction of business is a representation to every person dealing with it that the bank is able to keep and perform its contracts and that the person so dealing takes upon himself nothing more than the

ordinary risks incident to the business; in other words, it is a representation that the bank is solvent. If the fact be that the bank is insolvent, the representation so made is a false representation, and for the bank to receive deposits after its insolvency, when the depositor does not know of the insolvency, is to obtain the property of depositor by means of false representations. Usually, when one individual obtains the property of another by such means, the title to the property so obtained is voidable at the election of the party deceived. No substantial reason exists why the same rule should not apply to a bank. The business of a bank, it is true, is subject to regulation by the state, but a bank is not for that reason a state institution, nor is the property held by it state property; such property is the private property of the bank, and the bank deals with reference to it in the same capacity that an individual deals with his property. When, therefore, by fraud or unfair dealing it obtains the property of another, the property is recoverable at the election of that other.

And such we think is the consensus of the authorities. In *St. Louis & S. F. R. Co. v. Johnston,* 133 U. S. 566, the railway company mentioned in the title of the case drew a sight draft on another railway company for a large sum of money, and deposited the draft with the Marine National Bank of the city of New York to its credit. The draft was subsequently paid and the Marine bank received its proceeds. At the time of the deposit of the draft, the Marine bank was insolvent, and it was shortly thereafter placed in the hands of a receiver. The action was between the railway company and the receiver of the bank. Two questions are discussed in the opinion; the first, whether the bank obtained title to the draft by the

deposit, and the second, whether the receipt of the draft by the bank in its insolvent condition was a fraud upon the depositor. Touching the latter question, the court used this language:

"But if there could be any question on that [the first] branch of the case, we are unable to see that there could be on the other. This bank was hopelessly insolvent when the deposit was made, made so apparently by the operations of a firm of which the president of the bank was a member. The knowledge of the president was the knowledge of the bank. *Martin v. Webb,* 110 U. S. 7, 15; *Bank v. Walker,* 130 U. S. 267; *Cragie v. Hadley,* 99 N. Y. 131. In the latter case it was held that the acceptance of a deposit by a bank irretrievably insolvent, constituted such a fraud as entitled the depositor to reclaim his drafts or their proceeds. And the *Anonymous Case,* 67 N. Y. 598, was approved, where a draft was purchased from the defendants, who were bankers, when they were hopelessly insolvent, to their knowledge, and the court held the defendants guilty of fraud in contracting the debt, and said their conduct was not like that of a trader 'who has become embarrassed and insolvent, and yet has reasonable hopes that by continuing in business he may retrieve his fortunes. In such a case he may buy goods on credit, making no false representations, without the necessary imputation of dishonesty. *Nichols v. Pinner,* 18 N. Y. 295; *Brown v. Montgomery,* 20 N. Y. 287; *Johnson v. Morrell,* 2 Keyes 655; *Chaffee v. Fort,* 2 Lans. 81. But it is believed that no case can be found in the books holding that a trader who was hopelessly insolvent, knew that he could not pay his debts and that he must fail in business and thus disappoint his creditors, could honestly take advantage of a credit induced by his apparent prosperity and thus obtain property which he had every reason to believe he could never pay for. In such a case he does an act, the necessary result of which will be to cheat and defraud another and the intention to cheat will be inferred.' And it was decided

that 'in the case of bankers, where greater confidence is asked and reposed, and where dishonest dealings may cause widespread disaster, a more rigid responsibility for good faith and honest dealing will be enforced than in the case of merchants and other traders'; and that 'a banker who is, to his own knowledge, hopelessly insolvent, cannot honestly continue his business and receive the money of his customers; and although having no actual intent to cheat and defraud a particular customer, he will be held to have intended the inevitable consequences of his act, i. e. to cheat and defraud all persons whose money he receives, and whom he fails to pay before he is compelled to stop business.'

"The Circuit Court did not, in the present case, express any different view, but held that the bill was not properly framed to present the question. Certainly there must be sufficient equity apparent on the face of a bill to warrant the court in granting the relief prayed; and the material facts on which the complainant relies must be so distinctly alleged as to put them in issue. *Harding v. Handy,* 11 Wheat. 103. And if fraud is relied on, it is not sufficient to make the charge in general terms. 'Mere words, in and of themselves, and even as qualifying adjectives of more specific charges, are not sufficient grounds of equity jurisdiction, unless the transactions to which they refer are such as in their essential nature constitute a fraud or a breach of trust, for which a court of chancery can give relief.' *Van Weel v. Winston,* 115 U. S. 228, 237; *Ambler v. Choteau,* 107 U. S. 586, 591. The defendant should not be subjected to being taken by surprise, and enough should be stated to justify the conclusion of law, though without undue minuteness.

"The bill alleged that the bank was insolvent on the 5th day of May; that this was well known to its officers; that it wrongfully neglected to disclose its insolvency to complainant, and, by continuing business and otherwise, represented to complainant and all other persons dealing with it, that it was solvent; that complainant, on the faith of these representations

believed such to be the fact, without suspicion that the bank was, or was in danger of becoming, insolvent; that, acting upon the representations, and relying on the bank's solvency, complainant delivered the draft; that next morning the bank closed its doors, and the draft was collected thereafter; and that, by reason of the premises, the draft or its proceeds did not become the property of the bank. The receiver in his answer specifically denied these averments. We think the issue thus framed was sufficient to enable the court to proceed to a decree. The fraudulent intention flowed from the guilty knowledge, and the bank must be held to the consequences of a representation which it knew to be contrary to the fact, and upon which the complainant innocently acted. Granted that the mere omission to disclose the insolvency, if there had been ground for the supposition that the bank might continue in business, would not be sufficient, there is nothing for such a belief to rest on here. As a matter of pleading, the averment was that the bank wrongfully neglected to make the disclosure; as a matter of fact, the condition of the bank was so hopeless that it was its duty to make it. The omission to specifically state in the pleading the degree of insolvency which rendered the bank's conduct fraudulent, was not fatal, as the conclusion asserted showed the intention of the pleader, and the particular contention could fairly be tested on the hearing.

*"The decree is reversed, and the cause remanded with directions to enter a decree in favor of the complainant according to the prayer of the bill and to take further proceedings in conformity with this opinion."*

In *Cragie v. Hadley*, 99 N. Y. 131, 1 N. E. 537, 52 Am. St. 9, cited in the foregoing opinion, the court said:

"A corporation may be in a legal sense guilty of a fraud. As a merely legal entity it can have no will, and cannot act at all, but in its relations to the public it is represented by its officers and agents, and their

fraud in the course of the corporate dealings, is in law the fraud of the corporation. There is more difficulty in establishing a fraud against a corporation, than against an individual. This arises from the difficulty in many cases of determining whether the fraud charged is imputable to the corporation. There may be knowledge of a fact by an agent of a corporation, which if brought home to the corporation itself, would create responsibility in a given case, but as to which, notice will not be imputed to the corporation merely from the fact that it was known by the agent. We need not enter into the distinctions upon this subject. But the general rule is well established that notice to an agent of a bank, or other corporation intrusted with the management of its business, or of a particular branch of its business, is notice to the corporation, in transactions conducted by such agent, acting for the corporation, within the scope of his authority, whether the knowledge of such agent was acquired in the course of the particular dealing, or on some prior occasion. (*Holden v. N. Y. & Erie Bank,* 72 N. Y. 286; *Bank of U. S. v. Davis,* 2 Hill 452.) The drafts for the proceeds of which this action is brought, amounting to $14,793.37, were deposited by the plaintiffs in the usual course of business, with the First National Bank of Buffalo, between two and three o'clock in the afternoon of the 13th day of April, 1882, and were credited in the plaintiff's pass-book and on the books of the bank to their account. The bank closed its doors at the usual hour on that day and never opened them afterward. It turned out that the bank was irretrievably insolvent, owing debts to the amount of $1,300,000, with assets not exceeding in value forty per cent of its debts, and had been so insolvent for months before its failure. It does not admit of question that the condition of the bank was such that if it was known to its officers or agents charged with the direction and management of its affairs, a gross fraud was perpetrated on the plaintiffs in permitting them, in reliance upon its supposed solvency, to make the deposit in question. The bank

was not only irretrievably insolvent, but it had apparently given up the struggle to maintain its credit before the deposit was made. Its drafts had gone to protest on the 12th, and it was manifest that a condition of open insolvency must immediately ensue. The acceptance of the deposit under those circumstances constituted such a fraud as entitled the plaintiffs to reclaim the drafts or their proceeds."

In *Richardson v. New Orleans Debenture Redemption Co.,* 102 Fed. 780, 42 C. C. A. 619, 52 L. R. A. 67, the court said:

"Ordinarily, when funds are deposited in a bank, the relation of debtor and creditor immediately arises between the banker and the depositor. The money deposited becomes the property of the banker. He has the right to use it, but must pay the debt to the depositor by cashing his checks. When the banker obtains the deposit by committing a fraud, as by receiving it after hopeless insolvency, the relation between the parties is very different. The fraud avoids the implied contract between the parties that would arise in its absence, and, having barred contract, a trust is the equitable result. The fraud itself gives no lien. The fraud prevents the money deposited from becoming the property of the banker, and thereby prevents the relation of debtor and creditor arising between the parties. As the money does not become the property of the banker, it, of course, remains the property of the depositor. In the banker's hands, therefore, it is a trust fund,—as much so as if it had been a special deposit."

In *Wasson v. Hawkins,* 59 Fed. 233, the facts were that five minutes before a bank closed its business for the day Wasson deposited in the bank a sum of money in cash and another sum in checks drawn on other banks, the whole being credited to the depositor's account as cash. The bank was insolvent at the time of the deposit, and known to be so by its officers. It

did not again open for business, and later a receiver was appointed to wind up its affairs. Wasson sued the receiver to recover the deposit, and it was held on the facts shown that a case was made against the receiver. The judge, in delivering judgment, stated his conclusions as follows:

"The reception of the money and checks, under such circumstances, was a fraud upon the plaintiff, and entitled him to rescind the transaction, and recover back his deposit from the bank. The keeping of the bank open, and the conducting of its business in the usual manner, constituted a representation to its customers of the solvency of the bank, upon which they had the right to rely; and, if the bank was known to be insolvent by the officers who were charged with its management, the concealment of that fact from a person about to make a deposit would constitute a fraud upon him. The title acquired by the bank to the money and checks deposited under such circumstances would be voidable at the election of the depositor, who could bring suit to recover his deposit without any previous demand. The bank would become a trustee ex maleficio, and would hold the deposit for the use of the depositor and subject to his right of reclamation."

The following cases also recognize the principle, although in certain of them the rule was held inapplicable to the facts shown: *Higgins v. Hayden*, 53 Neb. 61, 73 N. W. 280; *Perth Amboy Gas Light Co. v. Middlesex County Bank*, 60 N. J. Eq. 84, 45 Atl. 704; *Brusegaard v. Ueland*, 72 Minn. 283, 75 N. W. 228; *Grant v. Walsh*, 145 N. Y. 502, 40 N. W. 209, 45 Am. St. 626; *Knaffl v. Knoxville Banking & Trust Co.*, 130 Tenn. 336, 170 S. W. 476, L. R. A. 1915D 402; *Western German Bank v. Norvell*, 134 Fed. 724; *City Bank of Hopkinsville v. Blackmore*, 75 Fed. 771, 21 C. C. A. 514; *City of Philadelphia v. Eckels*, 98 Fed. 485; *Frelinghuysen v.*

*Nugent,* 36 Fed. 229; *Boone County National Bank v. Latimer,* 67 Fed. 27; *Standard Oil Company of Kentucky v. Hawkins,* 74 Fed. 395, 20 C. C. A. 468; *Manufacturers' National Bank v. Continental Bank,* 148 Mass. 553, 20 N. E. 193, 12 Am. St. 598, 2 L. R. A. 699; *Guignon v. First National Bank,* 22 Mont. 140, 55 Pac. 1051; *First National Bank of Crown Point v. First National Bank of Richmond,* 76 Ind. 561.

There is a second consideration, however, always present in such cases. The right of recovery is not in damages for the tort committed; it is a right of recovery of the thing deposited, and the thing or its substitute must be found among the bank's assets when the bank is taken over for liquidation. When the thing deposited is a draft or check and remains in the bank at the time it is closed for insolvency, no difficulty is encountered, as checks have such ear marks as will lead to their identification. When, however, the deposit is money, or the deposit is a check or draft which has been converted into money, the recovery must be in kind. But the present case does not present the latter difficulty. The checks were in the bank uncollected when the bank was taken over by the bank commissioner, and were thus capable of identification and can be followed into his hands. The commissioner, it is true, converted them into money before the beginning of suit to recover them, but the money received from the conversion was impounded and now stands in lieu of the checks.

But the defendants say that the cashing of the checks was a conversion of the checks into money, that this money was intermingled with other moneys of the bank in the hands of the bank commissioner, and that there was no augmentation of the assets of the bank thereby, under the rule of the case of *Spiroplos*

*v. Scandinavian-American Bank of Tacoma,* 116 Wash. 491, 199 Pac. 997. The cases, we think, are differentiated by their facts, but if the principle involved can be said to be the same, we think on further consideration that the case cited should not be followed. It proceeds on the theory that the *net* assets of a bank must be augmented before there can be a recovery in kind. This overlooks the principle upon which a recovery is allowed. The recovery is still one in specie, but because the specific thing has been intermingled with other things of like kind from which it is indistinguishable, a taking is permitted from the common mass. This form of taking injures no one. For every coin taken which did not theretofore belong to the depositor he leaves a coin of his own of an equal value and amount in the mass. It is only necessary to show, therefore, that the gross assets of the bank, not its net assets, have been augmented by the deposit which it is sought to recover.

"Formerly the equitable right of following misapplied money or other property into the hands of the parties receiving it, depended upon the ability of identifying it; the equity attaching only to the very property misapplied. This right was first extended to the proceeds of the property, namely, to that which was procured in place of it by exchange, purchase, or sale. But if it became confused with other property of the same kind, so as not to be distinguishable, without any fault on the part of the possessor, the equity was lost. Finally, however, it has been held as the better doctrine that confusion does not destroy the equity entirely, but converts it into a charge upon the entire mass, giving to the party injured by the unlawful diversion a priority of right over the other creditors of the possessor." *Frelinghuysen v. Nugent,* 36 Fed. 229, 239.

"The right of a beneficiary to reclaim a trust fund is based upon his right of property, not upon any

right as a preferred creditor of the trustee.   Hence, it was formerly held that the blending of trust money with that of the trustee defeated the owner's title and reduced his status to that of an unsecured creditor of the trustee.   This on the theory that, having lost its identity, the trust money could not be followed and recovered *in specie*.   The inequitable results of this doctrine finally led a great majority of the courts to adopt the rule that where money held by one person as trustee for another has been commingled with money of the trustee and deposited in a bank to the trustee's individual credit, the balance in the bank may be charged with the trust.   This on the reasonable presumption that the trustee intends to use only what he has the right to use, and that whatever the trustee withdraws from the account is from his own part of the common fund and that the balance remaining includes the trust fund." *Heidelbach v. Campbell,* 95 Wash. 661, 164 Pac. 247.

The further contention is made that it is only the bank commissioner who can close a bank for insolvency, and from this the deduction is drawn that this bank was not insolvent within the meaning of the law as long as the bank commissioner permitted it to remain open.   But we think this a misconstruction of the statutes.   The statutes not only provide that the officers of a bank can close it for insolvency (Rem. Comp. Stat., § 3779), but make it a felony on the part of such officers to fraudulently receive a deposit, knowing the bank to be insolvent.   Id., § 3288.   However persuasive in favor of the contention an argument drawn from other provisions of the statute may be, we cannot conclude in the light of these sections that it was the intent of the banking code to vest in the bank commissioner alone the power to determine when and when not a bank is insolvent.

Another objection is that the complaint is not properly framed to present the question here dis-

cussed. But while the complaint may have been framed with the idea that the right of recovery rested on a different theory from that which we think recovery may be allowed, it had the merit of stating the facts, and since issue was joined thereon and proofs taken, it is within the power of the court to grant that form of decree the facts proved warrant. *St. Louis & S. F. R. Co. v. Johnston, supra.*

The trial court granted the new trial on the theory that it had drawn an erroneous conclusion of law from the facts proven, and its order is thus reviewable in this court. For the reasons stated, we think it in error in its final conclusion rather than in its first.

With reference to the second cause of action, the facts are these: On January 12, 1921, one Garnett was the owner of United States liberty bonds of the par value of $300. These bonds he desired to exchange for German marks at their then actual value, and applied to the Scandinavian-American Bank to make the exchange. The officer of the bank in charge of this department of the bank's business agreed on behalf of the bank to make the exchange, but stated that the bank did not then have the marks on hand, but would procure them later. Garnett thereupon left the bonds with the bank, but no actual exchange was made, and the bank passed into the hands of the bank commissioner three days thereafter because of its insolvency. On the day in which the bonds were left with the bank, they were placed among other bonds of like kind and denomination then held by the bank and a credit was given Garnett for their then actual value, namely, $288. On taking possession of the bank, the bank commissioner found therein bonds of a like denomination and kind of those deposited, but whether the

identical bonds or not the evidence failed to establish. The court allowed a recovery for a sum equal to the value of the bonds when delivered.

Seemingly a recovery was justified. If the title to the bonds did not pass to the bank by the delivery, as the court found, then the depositor can recover them as his own property. If, on the other hand, the title did pass to the bank by the delivery, as the defendants contend, the recovery can rest on the ground stated in our discussion of the first cause of action—that the bank became a trustee of the bonds because of their receipt while the bank was in an insolvent condition. It may be that the depositor (in this instance the plaintiffs as assignees of the depositor) was entitled to a more favorable judgment than the court awarded, but this is an objection not open to the defendants, as it is not legally aggrieved thereby.

The order granting a new trial as to the first cause of action is reversed with instructions to reinstate the former judgment. On the second cause of action the judgment is affirmed.

PARKER, C. J., MITCHELL, TOLMAN, and BRIDGES, JJ., concur.