(No. 5151.   July 16, 1929.)

ANNA CALLAHAN, Successor in Office to INEZ CAVE, Treasurer of Boundary County, Respondent, v. THE FIRST STATE BANK OF BONNERS FERRY, a Banking Corporation; E. W. PORTER, Commissioner of Finance, and P. A. DEVERS, Agent for Said Commissioner, Appellants.

[279 Pac. 414.]

O. C. Wilson and A. H. Oversmith, for Appellants.

A. T. Aronson and E. W. Wheelan, for Respondent.

GIVENS, J.—January 29, 1926, Inez Cave, as county treasurer of Boundary county, presented for deposit to the First State Bank of Bonners Ferry some $44,457.45. The bank did not have sufficient security to authorize it to receive such deposit but J. B. Cowen, cashier of the bank, advised Mrs. Cave that such security would shortly be obtained, whereupon she delivered the checks, drafts and money in said sum to the bank accepting a receipt as follows:

"June 29, 1926.

"Received of Mrs. Inez Cave, County Treasurer, Twenty-two Thousand three hundred eight & 27
Twenty-two Thousand one hundred forty-nine and 18–100 Dollars.

"To be held in escrow until collateral is furnished for same by bank.

"$22,149.18.

"$22,308.27.

"J. B. COWEN,
"Cash."

No security was furnished and on the sixth day of July the bank was, as an insolvent institution, taken over by the Commissioner of Finance, who delivered to the county treasurer the envelope containing the checks and moneys and accepted from her a receipt as follows:

"I hereby acknowledge receipt of all items of purported escrow as shown in totals on reverse side.

"INEZ CAVE,
"County Treasurer."

All of the $44,457.45 was later collected except $6,177.18, consisting of checks drawn on said bank, for which amount this suit was brought as a preferred claim as defined by sec. 77 of chap. 133 of the 1925 S. L.

The Commissioner of Finance disallowed the claim but on the trial in the district court judgment was entered in favor of the county for the amount of the claim from which judgment the appeal is here.

The decisive question is whether the facts in evidence support that portion of finding No. 7 of the trial court as follows:

"That at the time of making and giving said receipt aforesaid, the bank accepted and agreed to pay each of said checks and treated each of said checks as having been cashed and paid by the bank."

Or, as stated in respondent's brief, quoting from *Northwest Lumber Co. v. Scandinavian-American Bank*, 130

Wash. 33, 39 A. L. R. 922, 225 Pac. 825, ''Was there such a segregation of this particular fund from the moneys of the bank as to withdraw it from the general lien of the general creditors?''

There is no real dispute between the parties as to the law. It is clearly enunciated in respondent's brief, quoting from 3 R. C. L. 523, as follows:

''Where checks, drafts or other evidences of debt are received in good faith as money deposits, and the bank credits them as so much money, the title to the checks or drafts is immediately transferred to the bank, and it becomes legally liable to the depositor as for so much money deposited.'' (Citing *Wasson v. Lamb*, 120 Ind. 514, 16 Am. St. 342, 22 N. E. 729, 6 L. R. A. 191.)

See, also, *First National Bank v. Burkhardt*, 100 U. S. 686, 25 L. ed. 766; *Cohen v. First National Bank*, 22 Ariz. 394, 15 A. L. R. 701, 198 Pac. 122; *Gate City Bldg. & Loan Assn. v. National Bank of Commerce*, 126 Mo. 82, 47 Am. St. 633, 28 S. W. 633, 27 L. R. A. 401; *Fayette National Bank v. Summers*, 105 Va. 689, 54 S. E. 862, 7 L. R. A., N. S., 694, and note; *Raynor v. Scandinavian-American Bank*, 122 Wash. 150, 25 A. L. R. 716, 210 Pac. 499.

The question here involves merely a question of fact as to whether the checks were deposited for safekeeping or whether they were delivered as a true deposit with the understanding that the bank would cash the checks and retain the proceeds as a special deposit, or, when security was furnished, place it, secured thereby, in a general deposit.

A stipulation was entered into between the parties showing the status of the accounts of the different makers of the checks involved herein which shows that in some instances if the checks had been cashed when presented the accounts of some of the makers would have been overdrawn.

With reference to the placing of the checks in the bank, Mrs. Cave testified as follows:

''Q. Just what did you do on the 29th of June with regard to making this deposit?

"A. Well, on the 29th of June I took several deposit slips and the money and the checks to the bank to deposit, and when I presented them at the window Miss Howard was at the window, and she started to check these off to see that the lists were correct, and at that time Mr. Cowen stepped from the adjoining room and told me they had not secured collateral to cover these.

"Q. Did you have each item for deposit listed on your deposit slips?

"A. I did.

"Q. That included cash and all checks?

"A. It did.

"Q. On all banks, including First State?

"A. It did.

"Q. Did you have the totals added up?

"A. On each deposit slip, yes.

"Q. On each deposit slip.

"A. I think there were five deposit slips. I am not certain as to that, but there were several, because I made up the deposit slips for each day.

"Q. Now, did Mr. Cowen state at that time when they would be able to furnish securities?

"A. He said he didn't understand why collateral hadn't—why Liberty Bonds hadn't come at that time, but they would certainly be there in a day or two.

"Q. Now did the bank accept these—accept this deposit?

"A. They took them. At that time, why, of course, I couldn't deposit them because I didn't have the collateral, so as I had endorsed them and presented them there, I didn't know what to do with them, so I suggested I might get the money on the checks and Mr. Cowen informed me that they didn't have money enough on hand to pay those checks. As I had them endorsed and ready for the bank, I didn't know what to do with them. He suggested I put them in escrow, and so he had Miss Howard fully check the list; so Miss Howard checked the list and they were placed in an envelope in escrow and left at the bank and he gave me a receipt for the amount of money.

"Q. At that time did he accept all these checks?

"A. He did.    .

"Q. For payment?"

It will be noticed that no answer was given to the question, "For payment?"

■  The county was the plaintiff below and the burden of proof was on the plaintiff to show that these checks were accepted by the bank for collection, and that the proceeds and not the checks themselves were to be held, as the parties called it, "in escrow." The evidence further discloses that no entry was made in the records of the bank or in the pass-book of the treasurer. In this connection, Mrs. Cave testified further as follows:

"Q. Did you bring your pass-book with you at that particular time?

"A. I did.

"Q. State the reason the entry was not made at that time.

"A. Because at that time they didn't furnish collateral for these funds, so it was put in escrow until funds—until collateral was furnished and I was given a receipt for that amount of money which I considered would be entered on the pass-book as soon as collateral was furnished."

On cross-examination, she testified as follows:

"Q. And you also considered the checks on the First State Bank just the same as cash, also?

"A. I did.

"Q. At the time the First State Bank closed its doors you knew that the majority of the checks and at that time thought that all of the checks which were in the envelope still remained in that condition, did you not?    .

"A. I did."

Miss Howard, stenographer in the bank, testified as follows with reference to the placing of these checks in the bank:

"Q. What did you do after that relative to these checks and money?

"A. Well, I drew up an escrow agreement dictated by Mr. Cowen regarding this deposit and the checks and money and deposit were placed in an escrow envelope and that was placed in the safe.

"Q. Now, what, if anything, was said by Mrs. Cave relative to obtaining cash for any of these checks?

"A. Nothing that I know of.

"Q. She did not present the checks to you for payment for cash?

"A. No.

"Q. And you heard no discussion regarding it at all?

"A. No."

J. B. Cowen, cashier of the bank, with reference to these checks, stated as follows:

"Q. Did you on or about June 25, 1926, or at any other time, ask Mrs. Cave, the County Treasurer, to deposit money in the bank without collateral?

"A. No.

"Q. On or about June 29, 1926, did you tell Mrs. Cave as County Treasurer that the First State Bank could not pay the checks she had?

"A. No, I did not.

"Q. Did she present any checks to you for payment for cash?

"A. Not to me, no."

The evidence further shows that on the twenty-ninth day of June the bank did not have sufficient cash resources to pay the $44,457.45 in full, but did have enough to pay the checks drawn on itself, namely, $9,366.04.

From the above evidence, it is apparent that the county treasurer intended to place these checks drawn on the First State Bank in the bank for safekeeping and that they were not deposited for collection and that she expected to receive back from the bank the identical checks placed by her in the envelope covered by the written receipt. The bank became the bailee of the property left with it by the county treasurer, and having returned the identical property, is absolved

from further liability. (*Fogg v. Tyler*, 109 Me. 109, Ann. Cas. 1913E, 41, 82 Atl. 1008, 39 L. R. A., N. S., 847.)

The judgment is reversed, with instructions to enter judgment in favor of the appellants.

Costs to appellants.

Budge, C. J., and T. Bailey Lee, Wm. E. Lee and Varian, JJ., concur.