**TAFT et v GUARDIAN TRUST CO et**

Municipal Court of Cleveland

No 715682. Decided July 5, 1934

**OPINION**

By DRUCKER, J.

I. When a bank goes upon a restricted withdrawal basis but announces that it will accept new deposits without restrictions as to their availability, the scheme of operations envisaged thereby contemplates that whatever assets are the subject-matter of the new deposits shall be segregated from the previously acquired assets of the bank and that the divisions of the bank's business into new and old shall be maintained as sharp and distinct as if two separate banking corporations were handling the respective divisions.

Accepting for the moment plaintiff's contention that the $50 deposit is to be treated as the equivalent of a deposit made upon the morning of February 27, 1933, we turn to a consideration of that which plaintiffs deposited with the bank for credit to their checking account and find that it was a savings account withdrawal slip. In addition to its function as a receipt, a withdrawal slip is an authorization to the bank to charge the relative account in the designated amount. In the present case plaintiffs' savings account was reduced by $70; in consideration of such diminution plaintiffs received $20 in cash and a credit on their checking account for $50. As only the $50 credit is in controversy we shall generally ignore the cash payment of $20. Accordingly the net result of the transaction was that plaintiffs exchanged a savings credit for a checking credit. If on the morning of Monday, February 27, 1933, plaintiffs had presented to the bank a withdrawal slip, drawn against a restricted savings account, and had requested in exchange therefor, the credit of a like amount to a new, segregated account, they would, of course, have been met with a refusal by the bank. If, through the inadvertence of an officer or employee, such withdrawal slip had been accepted and a new non-restricted checking account had been opened for plaintiffs in exchange therefor, we entertain no doubt that upon discovery of the mistake the book entries could be lawfully reversed.

One cannot deny the force of the general rule that, once a bank has accepted as a deposit an instrument drawn upon itself and has given the depositor credit therefor, the transaction has, in the absence of contract stipulation to the contrary, attained finality and cannot be undone. Neither the inadequacy of the drawer's account nor the forgery of his signature give the bank competency to withdraw the credit. American National Bank v Miller, 229 U. S. 517, 33 Sup. Ct. 883; Cohen v First National Bank, 22 Ariz. 394, 198 Pac. 122; Rawles v Saulsbury, 66 Ga. 394; American Exchange National Bank v Gregg, 138 Ill. 596, 28 NE 839; Hay v First National Bank, 224 Ill. App. 286; First National Bank v Mammoth Blue Gem Coal Co., 194 Ky. 580, 240 SW 78; Black Mtn. Bank v Kelly, 213 Ky. 34, 280 SW 461; Schutts v Citizens Bank, 3 La. App. 547; Sewers Co. v First National Bank, 6 La. App. 721; Scotts Bluff County v First National Bank, 115 Neb. 273, 212 NW 617; People v Sheppard, 37 App. Div. 119, 55 N. Y. Supp. 1130; Consolidated National Bank v First National Bank, 129 App. Div. 538, 114 N. Y. Supp. 308; Oddie v National City Bank, 45 N. Y. 735; Levy v Bank of the United States, 4 U. S. 234, 1 Binn. 271; Bassett v Mechanics Bank, 168 Atl. 12 (Conn.)

But we conceive the hypothetical case to have additional elements which would render the general rule inapplicable. When a bank, in agreement with its clearinghouse associates and in accordance with the statutes, announces that withdrawals of deposits will be limited to certain percentages and amounts specifically set out in the announcement, it thereupon becomes the duty of such bank to adhere to the limitations set forth, to treat all depositors with the strictest impartiality within the terms of the limitations and to refrain from all activities, secret or otherwise, which would in their effects contravene the spirit of such conservatory action. Good faith to the utmost is the least that should be required in such circumstances. Having abandoned its contractual pretensions, the bank must stand in the position of a quasi-trustee and without favor or prejudice so conduct itself as to prevent the creation of preferences among its creditors. To hold that the bank would be bound by the entry of the checking credit as by an admission would be to accord plaintiffs preferential treatment and, in the events which have occurred including the insolvency administration of the bank, would be fraudulent as to other holders of restricted savings accounts.

Furthermore, to validate the hypothetical checking account credit, assumed above as actually made on the morning of February 27, 1933, would be fraudulent as to those persons making segregated, non-restricted deposits on and after such February 27. Plaintiffs' petition does not make clear the exact assets from which they have made demand to be paid. Inasmuch as plaintiffs' case rests upon the contention that they made a deposit after the bank had gone upon a restricted basis, and bearing in mind that new business of the restricting bank is presumed to have been kept distinct from the old, we assume that plaintiffs' demand relates to payment from assets acquired in the conduct of the new, segregated and non-restricted business. If the new business was sharply segregated from the old and if plaintiffs' deposit theory is correct, we should expect to find the subject matter of plaintiffs' deposit among the assets of the new business, all which constitute a fund out of which new, non-restricted depositors are to be paid. In the instant situation the only thing deposited by plaintiffs with the bank was a withdrawal slip drawn against itself. Their act in procuring the $50 credit (which is asserted to be non-restricted) passed no asset to the bank which it could segregate

along with the assets received from non-restricted depositors on February 27 and afterward. Assuming that $1000 of non-restricted deposits were made with the bank on February 27, represented by $1000 in cash and checks on non-restricting institutions, plaintiffs' contention would result in increasing the total of the day's non-restricted deposits to $1050, all payable out of the $1000 in assets received during the day. Such a result could not be countenanced. Those who deposit on the segregated basis are entitled to have the assets which were the subject matter of their deposits applied to the repayment of such deposits as against one who has procured a credit with the bank but who has passed no segregable asset to the bank which could be put in the common pool of segregated assets. To hold otherwise would be fraudulent as to those who have handed over real assets to the bank for segregated deposit.

Accordingly the contention of plaintiffs that this deposit is to be treated as if actually made on February 27, 1933, avails them nothing. It is probable, although we are not informed, that after the Guardian Trust Company passed into the hands of the Superintendent of Banks for liquidation, all the assets remaining as the subject matter of the non-restricted deposits were exhausted by being used in the repayment of such non-restricted accounts. Plaintiffs' position, in that contingency, is considered at another point in this opinion.

II. To this point this opinion has proceeded upon the assumption that the deposit of plaintiffs on Saturday afternoon should be treated as if made on the following Monday. In view of the conclusion arrived at in Part I, it is probably unnecessary to determine whether the deposit is to be considered as of Saturday or as of Monday, but since plaintiffs' brief is directed chiefly to that point we note the contention that the deposit was as of Monday only to reject it. Plaintiffs' argument insists upon the assumption that the deposit be treated as if made upon Monday because it was the custom of the bank to close its books on its Saturday business at noon, because the teller's "Paid" stamp on the savings withdrawal slip is dated February 27, 1933 (Monday) and because the monthly statement of account rendered to plaintiffs by the Coventry Office dates the $50 deposit as of February 27, 1933. We are unable to give our adherence to plaintiffs' line of reasoning.

When a bank as a matter of record closes its books at a certain hour of a business day and proceeds to balance its accounts

as of that hour, such a choice of time is made solely for internal, bookkeeping purposes and for the convenience of the bank and its employees. Such a choice of time does not, in any manner, preclude the lawful continuation of the bank's normal activities during the later hours of the same day. In Re Ruskay, 5 F. (2d) 143. Even the transaction of business after regular banking hours neither affects the validity nor lessens the finality of what is then done. Farmers Bank and Trust Co. v Boshears, 148 Ark. 589, 231 SW 10. The payment of a check after banking hours is proper and final; the transaction does not hang in a state of suspense until the opening of the bank on the next business day. If the bank seeks to recover from a payee as for a payment made under mistake of fact because of the inadequacy of the drawer's account to cover the check, it is met with the conclusion that the matter was a completed affair at the moment of payment. Spokane & Eastern Trust Co. v Huff, 63 Wash. 225, 115 Pac. 80. If the issue involves the legality (in respect to the rights of the drawer) of the payment of a check **after banking hours,** that issue is resolved in favor of legality, although the drawer, before banking hours on the next business day, enters an order to stop payment of the check. Raynor v Scandinavian-American Bank, 122 Wash. 150, 210 Pac. 499. If items not drawn on the bank of deposit are deposited **after banking hours** and a concurrent credit therefor is entered either in passbook or on a deposit slip, the title to the deposited items immediately passes to the bank of deposit; and the latter becomes simultaneously, the debtor of the depositor. In Re Ruskay, 5 F (2d) 143, 151. "The rights of the depositor do not depend upon the time when the bank's clerk enters a deposit or whether he enters it at all * * * It is the receipt of the deposit, and not the entry, which binds the bank." In Re Ruskay, supra, at p. 150.

The payment of a draft drawn against a savings account is final and is unaffected by the subsequent receipt of the depositor's stop payment order, although the payment is made and the order to stop payment received each at an hour earlier than that set by the by-laws for the opening of the bank. In such case the payment constitutes a diminution of the savings account at the moment of payment. Butler v Broadway Savings Institution, 157 N. Y. Supp. 532.

If, after the books of the bank have been closed for the day, a customer and bank officer perform such overt acts as would clearly have consummated a transaction if they had been performed before the books were closed, such conduct evidenced at the later hour must result also in a consummated transaction as of the time of the manifestation of such conduct. No attempt at metaphysical reasoning can justify the conclusion that a deposit tendered to the bank on Saturday afternoon and accepted by the latter as indicated by its concurrent issuance of a deposit slip therefor, was actually made on Monday morning. We choose to view the matter factually and not imaginatively.

Additionally, this court takes judicial notice of the fact that in the past the practice has prevailed among some banks of balancing each day's business at noon. Such banks, of course, performed their normal functions during the rest of the business day under the usual closing time. No one would seriously contend that a deposit made in such a bank on the afternoon of one day but appearing, as a matter of record, as part of the following day's business had not been completed as a legal transaction at the moment of actual acceptance. The instant case presents no different problem. The fact that the deposit in this case would in the usual course have been listed as a part of Monday's business merely for the purpose of balancing the books and dating entries in no way derogates from the fact that the transaction was closed as between bank and customer on Saturday afternoon, forty or more hours before the beginning hour of the restricted period.

Plaintiffs have assumed an inconsistent position in regard to the two phases of the situation presented by the use of the $70 withdrawal slip. There is no intimation that plaintiffs do not regard the withdrawal of $20 in cash, by the use of the $70 slip, as a completed transaction. We must likewise consider the utilization of the $50 part of the $70 withdrawal slip as final as of the same time, since the receipt of $20 in cash and the checking credit of $50 were the agreed exchange for the diminution of plaintiffs' savings account to the extent of $70.

III. There are other reasons why plaintiffs cannot prevail; it will suffice to note a branch of the case which would in any event be conclusive of plaintiffs' claim. Plaintiffs' brief states: "It is the contention of the plaintiffs, however, that this transaction did not constitute a general deposit before the following Monday, on the facts of this case, and for that reason there was no debtor-creditor relationship until that time and the bank would hold

the money, as trustee or bailee, until it accepted the offer of that money as a general deposit", and it concludes: "It is submitted that this money, left on Saturday afternoon, was accepted by the bank as a Monday deposit, and, having been accepted as a Monday deposit, it should have been held free from all restrictions. That being so, the plaintiffs are entitled to a **perference.**" By way of preliminary it may be noted that plaintiffs err in speaking of "money". There was no money involved in the making of the $50 deposit, the subject-matter of this action.

Considering plaintiffs' claim as one for preference, it is elementary learning that, apart from legislative fiat, preferences in insolvency liquidation are based solely upon equitable principles relating to bailments and express and constructive trusts. §§710-165, 712, 713 and 714 GC are not applicable to this case. Consequently reference must be made to equitable principles alone in the determination of plaintiff's demand.

First, there was no express trust or bailment in this case. The details of the transaction clearly indicate that there could have been no trust or bailment created by the acts of the parties, because there was no intention to establish either of those legal relationships. Clearly what both plaintiffs and bank intended was to transform a savings credit into a checking credit, to shift from one kind of a debt owed by the bank to another kind, to increase the total of bank obligations payable on check and decrease the total payable according to savings department regulations. Such objectives fail obviously in establishing the first requisite to the creation of a trust, namely, a trust intent. They establish clearly an intention the direct antithesis of a trust intent, namely, an intention to continue a debtor-creditor relationship. Those objectives were achieved by what occurred at the Shaker Square Office on Saturday, February 25.

Additionally, plaintiffs passed no asset to the bank which could have been the subject-matter of a trust or bailment. It is impossible to conceive of a trust without a trust res and in this case the agreed statement of facts fails to establish the existence of any such res. "A trust is a creature of equity. It has a body or corpus. You can derive proceeds from a trust fund, but there must be a corpus to produce it. * * * If there is no corpus, there is no trust." **Fulton v Gardiner, 127 Oh St 77.** At the conclusion of the transaction at the Shaker Square Office the bank possessed no asset that it did not own before and consequently, even if there had been an intention to establish a trust or bailment, such intention would have been ineffective because there would have been no property which could have been the subject-matter of it. What plaintiffs handed to the bank was a savings withdrawal slip, which was equivalent to the direction: "Diminish my credit with you by the amount of this slip." Such a diminution of liabilities is not an increase of assets for the purpose of establishing a trust res. "At common law a trust res is not created by charging a depositor's account with the amount of his check." **Fulton v Baker-Toledo Co., Supreme Court of Ohio, No. 24209, decided April 11, 1934.** Either an augmentation of assets or a segregation of some previously owned assets with the intention to make them the subject-matter of a trust is necessary to the creation of any trust. To adopt the words of the Supreme Court of the United States: "The cancellation of the credit balance by the debit (of the savings account and the concurrent creation of a checking credit) neither suggests any intention to establish a trust nor points to any identifiable thing which could be the subject of it." Blakey v Brinson, 286 U. S. 254, 52 Sup. Ct. 516.

In any event, plaintiffs received exactly what they bargained for as the consideration for the diminution of their savings account—a shift in the kind of intangible owned by them,—a checking credit in place of a savings credit.

Second, there could be no constructive trust in this case for the reasons stated in the second preceding paragraph. A constructive trust, as an invention of courts of equity is brought into existence usually as a "fraud-rectifying" device (Costigan, The Classification of Trusts, 27 Harvard L. Rev. 437, 439), whose sanctions run against a defendant who has secured the title to property under conditions which would make its retention a fraud upon plaintiff. It is a fictional remedial institution, imposed ordinarily in direct opposition to the intention of the constructive trustee who is made to account and to perform certain fiduciary duties as if he were an express trustee of the property in question. A wronged or defrauded owner may, by appropriate action, invoke the constructive trust doctrine and have the wrongdoer decreed a constructive trustee of the property of which the plaintiff has been defrauded or of the proceeds of that property. What results in an insolvency proceeding is a decree for the delivery to the plaintiff

of specific assets. The very property diverted by the wrongdoer or its proceeds are separated from the estate of the insolvent and delivered to the claimant who is thereby, in popular parlance, "given a preference" in the liquidation of the estate. But in order to utilize the constructive trust doctrine there must be some property to which the trust can attach. A court cannot materialize a trust in the total absence of property. A preference cannot be decreed as a matter of general priority, because a preference relates to the right to reclaim specific assets. Accordingly, a preference claimant must show the applicability of the constructive trust doctrine by proving that initially some property passed from himself to the bank which it would be inequitable or fraudulent to permit the bank to retain. Plaintiffs here in no way increased the assets of the Guardian Trust Company by the transaction of February 25, 1933. The utmost that can be said is that the bank's liabilities to defendant were diminished by the debit to plaintiffs' savings account. No asset was thereby produced to which a constructive trust could attach, unless it can be said that the bank held upon such a trust that porton of its savings account debt which had been subtracted from the savings balance. It is difficult to conceive of one holding as trustee a debt owed by himself as an individual. But if the doctrine of merger be not allowed to operate, either legally or metaphysically, the debt remains but a debt, an intangible without body except as a legal idea and still owed as an unsecured legal duty by the trustee in his capacity as a private debtor. There is no process by which it can be reified into a horse or a cow or Federal Reserve notes or silver dollars. It would still remain the trustee's personal debt. Consequently in the matter of establishing a corpus for a trust, "The result of the cancellation of a debt is purely negative." Bogert, Failed Banks, Collection Items and Trust Preferences, 29 Mich. L. Rev. 545, 559.

Even if some asset has passed to the bank from the plaintiffs, they as preference claimants, have not sustained the burden of proof. That burden, which is always on him who claims preference (Rottger v First-Merchants Nat. Bank, 184 NE 267; Rottger v Delta Delta Delta Realty Corp., 184 NE 413; Appeal of Mehler, 310 Pa. 25, 164 Atl. 619) extends not only to showing the exact assets received by the bank initially as an express trustee or as a trustee ex maleficio, but requires that the claimant prove that the property in which he had a beneficial interest, or its proceeds, was in the hands of the bank at the time the administrator in insolvency took possession. If, at the time the bank closed such proceeds had been fully dissipated or lost and so never came to the hands of the liquidator, the claimant would have no ground for demanding a preference. Leach v Iowa State Savings Bank, 204 Iowa, 497, 212 NW 748; Salem Elevator Works v Commissioner, 252 Mass., 266; 148 NE 220; State v Farmers State Bank, 54 Mont. 515, 172 Pac. 130; Groff v City Sav. Fund & Trust Co., 46 Pa. Super. Ct. 423; Farmers State Bank v Smith, 53 S. D. 641, 222 NW 143; Shaw v Lamar County, 12 SW (2d) 607 (Tex. Civ. App.); Dixon v Hopkins, 56 F. (2d) 783; Sanders v Stevens, 51 F. (2d) 743; Dickson v First Nat. Bank, 26 F. (2d) 411; Titlow v McCormick, 236 Fed. 209; American Can Co. v Williams, 178 Fed. 420; City Bank v Blackmore, 75 Fed. 771. But the burden is not on the liquidator to prove such dissipation; it is upon the claimant to prove the presence of his property or its proceeds among the assets of the failed bank. Appeal of Mehler, supra; Rottger v First-Merchants Nat. Bank, supra; Leach v City-Commercial Savings Bank, 207 Iowa 1254, 219 NW 496; People v People's State Bank, 354 Ill. 519, 188 NE 853; see Dixon v. Hopkins, 56 F. (2d) 783; Armour Fertilizer Works v Smith, 68 F. (2d) 794; Lathrop v Hampton, 31 Cal. 17; Seitter's Estate v Howe, 182 Ill. 351, 55 NE 526.

If we could assume that the bank, as an express or constructive trustee, received some property from the plaintiffs, that fact alone would not entitle them to a preference upon the insolvency of the bank. "A trust creditor merely as such has no preference over others." Webb v Newhall, 274 Pa. 135, 177 Atl. 793. "Apart from statute in the distribution of the assets of an insolvent or deceased trustee, a claim based on the duty of the trustee or its breach, is entitled to no priority because of its origin." Worcester Bank & Trust Co. v Nordheim, 188 NE 492 (Mass.). The right to receive preferential payment in the course of the liquidation of an insolvent estate cannot rest simply upon a debt owed by the insolvent to him who makes the claim or upon a breach of contract. Proof of a breach of fiduciary duty, or of fraud, standing alone, no more establishes a title to such a right than does proof of a wrongful conversion of property. "In the absence of ability to trace the misapplied funds into property of the insolvent trustee, the beneficial owner is only a creditor to the extent of his claim." Perry on Trusts (7th

ed. 1929) §836. The right to a preference is a property right attaching, by force of the constructive trust doctrine, to some one or more of the assets which come into the possession of the insolvency administrator.

("The so-called right to be preferred in case of wrongful conversion is a right of ownership—a right of property; a right which lays hold of the property whether in its original or in a substituted form; a right which follows the property so long as it can be ascertained to be the same property or its product. When the means of ascertainment of the identity of property or proceeds fail, the right fails." Multnomah County v Oregon Nat. Bank, 61 Fed. 912).

"The equitable right to trace the trust fund and impress the fund with which it has been commingled or the property into which it has been merged with the trust, is rested upon the right of property and not on a theory of preference arising from an unlawful conversion." Hanover Nat. Bank v Thomas, 217 Atl. 494, 117 So. 42.

("The law recognizes a claim for a preference based on a right of property in specific assets in the possession of an insolvent bank at the time it ceased to do business. * * *˙A trust, however, necessarily involves the relationship between two persons with respect to certain property, and unless the claimant shows, in the case, for example, of an insolvent bank, that the receiver has possession of the whole or a part of the property or its proceeds, the claimant does not place himself in a relation to the insolvent's estate which differs from that of an ordinary creditor, and, as a consequence, no trust can be declared or enforced." People v People's State Bank, 354 Ill. 519, 188 NE 853).

The following application of the general rule is illuminating: "It is also true that when it comes to the proofs plaintiffs may not recover. * ** if it (the proof) shows an agreement fixing a trust upon the funds, but fails to show that the funds * * * either in their identical form or in a traceable substituted form, were in the hands of the Mortgage Company at the time of the receivership, and so passed into the hands of the receiver, as it is true that proof alone that at one time the Mortgage Company held funds in trust, and mingled them with other assets without proof identifying the funds or assets with which they were mingled and the condition of those funds or assets when they passed into the hands of the receiver, will not suffice." Dixon v Hopkins, 56 F. (2d) 783.

("But the right to a priority over other creditors in the distribution of the assets of the trust company is not conferred upon appellants by the mere conversion of their property; it depends, rather, upon their ability to show that property in the possession of the trust company at the time it closed its doors was obtained as a result of the conversion, and is therefore subject to a trust in their favor. In other words, to be entitled to priority, appellants must trace the proceeds received from the conversion and identify them as contained in some specific fund or property in the possession of the trust company at the time it was taken over by the secretary of banking." Appeal of Mehler, 310 Pa. 25, 164 Atl. 619.)

To recapitulate: For the establishment of the right to a preference without the aid of a statute, a plaintiff must show the presence of two factual prerequisites, the first of which avails him nothing as a **preference** claimant without the joinder of the other: first, that the plaintiff passed some asset to the insolvent which the latter received as a bailee or express trustee or under such fraudulent circumstances as to make it a constructive trustee, and second, that the person administering the insolvent estate has received for purposes of administration that very asset or some other asset produced in whole or in part by the misappropriation of the original asset. Plaintiffs herein have sustained the burden of proof in neither branch.

If the conduct of the Guardian Trust Company in receiving the checking account credit of $50 be deemed fraudulent as to plaintiffs because the officials of the bank knew the bank to be insolvent at the time of the acceptance of such deposit a contention not raised by plaintiffs in their briefs, plaintiffs might be entitled because of the fraud to have the entire transaction of Saturday, February 25, 1933, rescinded and the status quo restored, upon a tender of the $20 cash which they received as a part of the transaction. Such rescission would, of course, merely restore to the savings credit the amount of the reduction which had been authorized by the savings withdrawal slip and result in the cancellation of the amount credited to the checking account.

IV. This case has been treated in the preceding paragraphs as if a single banking organization—a unitary bank—were involved. Counsel have touched only incidentally upon the branch banking problem which is readily apparent. Stated in its broadest form that problem is this: In a transac-

tion involving two branches of the same bank, to what extent is the transaction to be considered as one within a single entity, and to what extent is it to be treated as occurring between two entities? In the narrower and more particularized aspect presented by this case, the question is: Within the internal organization, what authority does one branch have to act for another branch? The answer to the latter question will determine whether in the last analysis plaintiffs are, in regard to the $50 deposit in controversy here, savings depositors or checking depositors.

That, for some purposes, the branch banking corporation will be regarded as one indivisible unit has been heretofore decided in this state. **Petrie v Garfield Savings Bank Co., 8 Oh Ap 266.** It is equally clear that for other purposes the branches will be treated as if they were separate banking institutions. Chrzanowski v Corn Exchange Bank, 173 App. Div. 285, 159 N. Y. Supp. 385. As a matter of authority within the Guardian Trust Company organization, did the Shaker Square Office have authority to receive checking account deposits for the Coventry Office? Did it have authority to act for the Coventry Office in honoring demands for withdrawals from Coventry Office savings accounts? Could it properly shift a savings credit at the Coventry Office to a checking credit at such latter office? If so, was that shift of relationship completed by the acts which were performed at the Shaker Square Office and before advices thereof were received by the Coventry Office?

The agreed statement of facts gives no direct aid in determining the question of internal authority and resort must be had to the inferences to be derived from that statement. Without giving our unqualified adhesion to all that is enunciated in Petrie v Garfield Savings Bank Co., supra, the conclusion of the court is that for the purposes of this case the deposit transaction here involved is to be treated as if occurring within the walls of a single unitary institution. The mere fact that a teller at the Shaker Square Office would pay out cash upon presentation of a Coventry Office savings passbook, that he would make entries in such passbook and so vary an evidence of indebtedness issued by the latter office, that he would accept on behalf of the Coventry Office a deposit slip made out by plaintiffs for the $50 credit in question either indicates express authority so to act or is evidence of a custom so to effect transfers from a savings account to a checking account at one branch by acts

done at another branch. It follows that legally and factually plaintiffs' savings credit with the Guardian Trust Company was reduced $70 and plaintiff's checking credit was increased $50 by the acts consummated at the Shaker Square Office on the afternoon of February 25, 1933.

However, if it were proper to hold that the Shaker Square Office could do no acts which would have the effect of shifting a part of plaintiffs' savings credit to a checking credit until the Coventry Office had been advised of the action by the Shaker Square Office and had ratified the same, plaintiffs' case would not be aided, because in that event plaintiffs' savings account would have remained undiminished (as to the $50 portion of the $70 withdrawal slip) and plaintiffs would be ordinary general savings account creditors as to such $50.

V. Questions of jurisdiction in the supervision of the liquidation of the bank and defendant's objections to evidence have not been considered in this opinion, inasmuch as plaintiffs' demand for a preference can in no event be sustained. It follows that upon the agreed statement of facts plaintiffs are entitled to share in the distribution of the assets of the Guardian Trust Company only as general deposit creditors.